EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| League of United Latin American Citizens – Richmond Region Council 4614, Eliud Bonilla, Luciania Freeman, Abby Jo Gearhart, and Jeanne Rosen, | ) ) ) ) ) ) | |
| Plaintiffs, | ) | Civil Action No. _1:18cv423_  (LO/IDD) |
| v. | ) ) ) | |
| PUBLIC INTEREST LEGAL FOUNDATION, an Indiana Corporation, and J. CHRISTIAN ADAMS | ) ) ) ) | |
| Defendants. | ) ) ) | |

## COMPLAINT

### INTRODUCTION

1.    In our democracy, all eligible Americans must be able to participate in elections, free from unlawful interference or impediments.  For generations, this country has fought to secure the right for all eligible Americans to vote in our elections free from intimidation or threats.  Protecting these hard-won rights requires steady vigilance, as the techniques used to intimidate or otherwise suppress the participation of voters evolves over time.  This case concerns one modern form of voter intimidation: the groundless assertion that certain eligible voters are committing voter fraud by participating in elections.  Such accusations are almost

invariably unfounded in fact; overwhelming evidence demonstrates that actual instances of voter fraud are vanishingly infrequent.[1]

2.      Spurious accusations of voter fraud cause real harm – both to the accused individuals and to our broader democracy.  Plaintiffs in this case include four Virginia voters accused by Defendants of committing state and federal felonies by participating in the electoral process.  These private citizens did not seek the public limelight or political power; they merely wished to exercise their fundamental right to participate in our elections.  The false accusations leveled against them – now archived on the internet for the general public to see and further disseminate – give rise to a variety of harms to these individuals that have the effect of intimidating them from voting or registering to vote.

3.      This is the kind of insidious modern technique of voter intimidation that civil rights laws are intended to eradicate.  These false accusations are also the sort of assaults on Plaintiffs' reputations that the law has long recognized as defamation.  Likewise, this form of voter intimidation affects the work of the organizational Plaintiff in this case, League of United Latin American Citizens – Richmond Region Council 4614, and the voting behavior of its members and the Latino community it serves.

4.      The Defendants are the Public Interest Legal Foundation and J. Christian Adams. Together, Defendants and others conspired to release two so-called "bombshell" exposés— which were publicized to media across the country, published on the internet, shared on

---

[1] *See, e.g.*, Justin Levitt, *A Comprehensive Investigation of Voter Investigation of Voter Impersonation Finds 31 Credible Incidents Out of One Billion Ballots Cast*, WASHINGTON POST (Aug. 6, 2014), https://www.washingtonpost.com/news/wonk/wp/2014/08/06/a-comprehensive-investigation-of-voter-impersonation-finds-31-credible-incidents-out-of-one-billion-ballots-cast/?tid=a_inl&utm_term=.72b02eea461a.

social media, and subsequently submitted to the Presidential Advisory Commission on

Election Integrity ("Presidential Commission")—that alleged that specific, named Virginians

committed felony voter fraud and should be prosecuted.

5.     Defendants gave their first supposed "exposé" the provocative and threatening

title of "*Alien Invasion in Virginia*" ("*Alien Invasion I*").  The report stated that over a

thousand individuals had "***registered to vote illegally***" in Virginia.  Ex. A, at 2 (italics and

bold in original)[2].  The report then went on to list many of those purported felons' names and

home addresses, and, in some cases, even their *home phone numbers*, in the report's exhibits

(see Exhibits 1 and 7 to the report).  This report and associated voter information is still

available online.

6.     The next supposed "exposé" kept the threatening moniker—this time dubbed

*Alien Invasion II*—and expanded Defendants' false assertions that certain Virginians were

committing specific instances of felony voter fraud.  *See* Ex. B ("*Alien Invasion II*").  For

example, *Alien Invasion II* accused hundreds of named residents of Prince William County of

committing felony voter fraud, suggesting that the United States Department of Justice "**has

done nothing about the felonies *committed* by 433 suspected aliens registered in Prince

William County alone.**"  Ex. B, at 6 (italics added, bold in original).  The report accuses

1,852 Virginia voters of being "**illegal registrants**" who cast nearly 7,500 ballots by voting

"**in elections dating back to 1988**" and thereby committing "felonies upon felonies."  Ex. B,

at 1, 3 (bold in original).  And, once again, Defendants published the names, home addresses,

---

[2] Names, except those of Plaintiffs, and personal information of individuals listed in the exhibits
to this complaint have been redacted.

3

telephone numbers, and, in some cases, social security numbers of these individuals. This report and associated voter information is also still available online.

7.     Defendants' "exposés" are predicated on specific, harmful falsehoods about numerous individuals made without due diligence to confirm the accuracy of the accusations. Defendants base their allegations that certain individuals committed felony voter fraud on the fact that those citizens were removed from the voting rolls for *potentially* being non-citizens. But, as Virginia elections officials have repeatedly emphasized to the Defendants, U.S. citizens can be removed from the voting rolls for various reasons—including routine paperwork errors. Thus, Defendants' repeated allegations that certain Virginians were non-citizens and repeat felons were based on a demonstrably false proposition—of which Defendants were fully aware. Subsequent media investigations have conclusively demonstrated that Defendants falsely implied that scores of constitutionally eligible Virginians committed multiple voter fraud felonies.

8.     These reckless allegations risk serious harm to the reputations of innocent Virginians. In the age of the internet, Google, and social media, where these reports remain easily accessible, even being *accused* of a felony can have life-altering economic, emotional, and social consequences.

9.     Defendants' ongoing defamation campaign is a modern, covert, and particularly insidious method of voter intimidation. An objectively reasonable individual named in either of the reports, or fearful of being wrongly named in future reports, would simply not register or vote again because the benefit from doing so would not outweigh the significant potential risk that the voter would be a continued target of Defendants' ongoing and intensifying defamation campaign that could have devastating effects on their careers and personal lives,

or make them susceptible to harassment by "ballot security" activists[3] (who now have access to their contact information by virtue of these published reports).

10.    Defendants' conduct violates both federal and state law.  The reckless and false allegations that specific, named individuals committed felonies constitute textbook cases of per se defamation under Virginia law.  Defendants' defamation campaign also violates both the Voting Rights Act, *see* 52 U.S.C. § 10307, and the Ku Klux Klan Act, *see* 42 U.S.C. § 1985(3), because it intimidates constitutionally eligible voters, like Plaintiffs, into not exercising their right to vote.

11.    Plaintiffs have not sought notoriety or attention or high office or to wield public power.  They simply want the same unfettered right to participate in our democracy free from harassment or intimidation that our country guarantees to every eligible voter.  They bring this suit to redress the injuries they personally have suffered, to ask the court to stop Defendants' continuing violations of the law, and to deter Defendants and others from this insidious form of voter suppression in the future.

## PARTIES

12.    Plaintiff League of United Latin American Citizens – Richmond Region Council 4614 ("LULAC") is a membership-based organization that works to advance the economic condition, educational attainment, political influence, health, housing, and civil rights of the Latino population of the city of Richmond, Virginia, and the surrounding area, including

---

[3] These are individuals who engage in various activities, including challenging voters at polls, that in certain instances have been alleged to suppress or interfere with voting rights.  *See generally* Wendy Weiser and Vishal Agraharkar, *Ballot Security and Voter Suppression: What It Is and What the Law Says,* Brennan Center for Justice (Aug. 29, 2012), https://www.brennancenter.org/publication/ballot-security-and-voter-suppression.

Hannover, Henrico, and Chesterfield counties, as well as the Tri-Cities area, which is comprised of the cities of Colonial Heights, Petersburg, Chester and Hopewell.  As part of its mission, LULAC engages in a wide variety of political participation initiatives, including voter registration and voter outreach and education efforts.

13.     Plaintiff Eliud Bonilla is a current resident of the state of Maryland who resided and voted in Herndon, Virginia, from 1999 until 2013.  He is of Puerto Rican descent.  Mr. Bonilla is a citizen born in Brooklyn, New York and has been a regular voter his entire adult life.

14.     Plaintiff Luciania Freeman is a resident of Woodbridge, Virginia and a registered voter in Prince William County, Virginia.  She is African American.  Ms. Freeman is a citizen born in Fayetteville, North Carolina.  She first registered to vote when she was 18 years old.

15.     Plaintiff Abby Jo Gearhart is a resident of Barhamsville, Virginia, and a registered voter of New Kent County, Virginia.  Ms. Gearhart is a citizen; she was born in Newport News, Virginia, and has lived in Virginia her entire life.  She has been a regular voter in Virginia since she registered at age 18.

16.     Plaintiff Jeanne Rosen is a resident of Yorktown and a registered voter in York County, Virginia.  Ms. Rosen is a citizen born in Brooklyn, New York.  She first moved to Virginia and registered to vote in 2013 and remained in Virginia until moving to Kansas in 2014.  Ms. Rosen returned to the Commonwealth in 2016, and voted in the 2016 presidential election.

17.     Defendant Public Interest Legal Foundation ("PILF") is a 501(c)(3) organization incorporated in the state of Indiana and has its principal place of business in Indianapolis, Indiana.

18.     Defendant J. Christian Adams is President and General Counsel of PILF.  Mr. Adams also participated as a member of President Trump's recently disbanded Presidential Advisory Commission on Election Integrity.  That Commission has been described by noted election-law expert Professor Richard L. Hasen as a "rogue's gallery of the country's worst voter suppressors."[4]  Even after the Presidential Commission was disbanded amidst multiple federal lawsuits, Mr. Adams publicly indicated his intention to continue his work on defamatory and intimidating "exposés" such as those at issue here.[5]  Mr. Adams resides in Alexandria, Virginia.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331.  Plaintiffs' claims under 42 U.S.C. § 1985(3) and Section 11(b) of the Voting Rights Act (codified at 52 U.S.C. § 10307) arise out of federal law.

---

[4] Richard L. Hasen, *Beyond Words: J. Christian Adams Appointed to Pence-Kobach Commission*, Election Law Blog (July 10, 2017), http://electionlawblog.org/?p=93726 (explaining that "it is hard to imagine a list of people less credible on the issue of voter fraud in the United States").

[5] Hans von Spakovsky and J. Christian Adams, *The Obstruction of a Vital Election Integrity Commission*, WASH. EXAMINER (Jan. 9, 2018),  http://www.washingtonexaminer.com/the-obstruction-of-a-vital-election-integrity-commission/article/2645401 (continuing to tout the findings of the defamatory *Alien Invasion* reports and vowing that "we and others dedicated to protecting our democratic system will continue our work" performed as members of the commission).

7

20.     This Court has supplemental jurisdiction over Plaintiffs' state law claim under 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over Defendant Adams as a resident of Virginia and over Defendant PILF under Virginia's long-arm statute, Va. Code § 80.1-328.1. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

22.     Defendants Adams and PILF conspired with each other and with non-party Virginia Voters Alliance ("VVA") to draft, publish and publicize *Alien Invasion I* and *Alien Invasion II*. As set forth below, the publication and dissemination of those reports violated the civil rights of Plaintiffs and defamed them.

### Defendants Make Their Initial False Allegations in a Report Entitled "*Alien Invasion I*"

23.     *Alien Invasion I* was published in September 2016.[6] Defendant PILF and non-party VVA were the named authors of the report. On information and belief, Defendant Adams participated in the drafting of the report. Defendant Adams participated in the publication and dissemination of the report through authoring articles and granting media interviews.[7]

---

[6] The report is available online at https://publicinterestlegal.org/files/Report_Alien-Invasion-in-Virginia.pdf (last accessed April 11, 2018).

[7] *See, e.g.,* J. Christian Adams, *Yes, Virginia, Aliens Are Registered or Voting … and in Pennsylvania, by the Thousands*, PJ MEDIA (Oct. 3, 2016), https://pjmedia.com/jchristianadams/2016/10/03/yes-virginia-aliens-are-registered-and-voting-and-in-pennsylvania-by-the-thousands/.

8

24.     Defendants publicized *Alien Invasion I* to national media via press releases and postings on Facebook and Twitter.  Media outlets further disseminated the report's assertions to a broad audience.[8]

25.     *Alien Invasion I* accuses the voters named in it of committing multiple, separate felonies, from illegally registering to vote to casting an ineligible ballot.

26.     The report characterizes the existing voter registration system as an "ineffective honor system under which the alien need merely lie to get on the voter rolls." Ex. A, at 1. The report then asserts that Defendants and VVA had "***found 1046 aliens who registered to vote illegally***." Ex. A, at 2 (emphasis in original).  The report explains that "[w]hen non-citizens register or actually vote, they violate both state and federal statutes because citizenship is a requirement to vote in both state and federal elections."  Ex. A, at 3.

27.     *Alien Invasion I* purports to base its accusation that non-citizens have voted illegally on "**list**[s] **of registrants who had been purged from the voter rolls because they were determined to not be U.S. citizens**." Ex. A, at 6 (emphasis in original); *see also* Ex. A, at 12 ("This data is but a minor snapshot. . . . It represents *non-citizen registrants*. . . and includes only those *non-citizens* that were *discovered to have been improperly registered*. . ." (emphasis added)).

28.     The report asserts the discovery of multiple lists of non-citizen felons in the following Virginia counties:

---

[8] *See, e.g.*, Neil W. McCabe, *Illegal Foreign Voting in Virginia Covered Up By Soros-Backed Democratic Officials, Says Report*, BREITBART NEWS (Oct. 2, 2016), http://www.breitbart.com/big-government/2016/10/02/virginia-illegal-voting-fraud-coverup/.

- Alexandria.  *See* Ex. A, at 6 (alleging that "**70 registrants . . . had been removed from Alexandria's registration lists after they were determined to not be U.S. citizens**" (bold in original)).

- Bedford.  *See* Ex. A, at 8 (stating county "provided a list of 35 non-citizens that had been removed from their voter rolls").

- Prince William.  *See* Ex. A, at 7 ("**Prince William County provided a list of *433 non-citizens* who had registered to vote in the county, but were then removed after they were determined to not be U.S. citizens.**" (bold and italics in original)).

- Roanoke.  *See* Ex. A, at 8 (claiming county "provid[ed] a list of **22 alien registrants**" (bold in original)).

29.     The report's exhibits then provide lists of the alleged felons by name.  Plaintiff Luciania Freeman was listed in *Alien Invasion I*, along with her contact information, including address and phone number.  *See* Ex. C (containing the page from the report's Exhibits 1 and 7 which lists Ms. Freeman).

30.     The clear implication of *Alien Invasion I* to an objectively reasonable reader is that Ms. Freeman, resident of Prince William County, and other listed individuals should not have registered or voted, and by doing so, committed felonies under state or federal law.  The report states clearly: "**The United States Attorney in Virginia has done nothing about the *felonies committed by 433 aliens* registering in Prince William County alone.**"  Ex. A, at 8 (italics added, bold in original)); *see also* Ex. A, at 2 (claiming the discovery of "*1046 aliens who registered to vote illegally*" (bold and italics in original)).

10

31.     Labeling the individuals named in the reports as non-citizens and therefore felons with reckless disregard for the truth of those accusations acts to intimidate and threaten those individuals and to deter them from voting or registering to vote.  Indeed, Defendant Adams suggested to *Breitbart News* that these individuals should be prosecuted:

> "*When an alien registers to vote, it is a felony* . . . . When an alien votes, it is multiple felonies.  DOJ under Obama has stopped enforcing this law.  *We name the names of the registered voters removed from the rolls for citizenship problems.  Will DOJ prosecute any of them*?"[9]

32.     Defendants' felony accusations are false.  The county registrar information relied on by Defendants and VVA does not establish that any particular voter is a not a citizen or that their conduct is felonious.  The registrar lists simply establish that certain voters were removed from the voting rolls, which Defendants know can occur for various reasons— including accidental failures to respond to government inquiries or routine paperwork errors.  In fact, Plaintiff Freeman is a natural-born United States citizen and an eligible voter in the state of Virginia where she is registered.  Hers was a case of paperwork error, in which a government official mistakenly believed that she was a non-citizen based on a Department of Motor Vehicles form.  In going beyond what the registrar's information actually establishes and accusing people like Ms. Freeman of committing felonies, Defendants not only defame these individuals, but also intentionally intimidate and threaten these individuals and other potential voters to deter them from registering to vote and voting.

33.     On information and belief, before Defendants published *Alien Invasion I,* Virginia elections officials informed Defendants that they were drawing false conclusions from the

---

[9] Neil W. McCabe, *Illegal Foreign Voting in Virginia Covered Up By Soros-Backed Democratic Officials, Says Report*, BREITBART NEWS (Oct. 2, 2016) (emphasis added), http://www.breitbart.com/big-government/2016/10/02/virginia-illegal-voting-fraud-coverup/.

registrar information and running the significant risk of wrongfully accusing constitutionally eligible voters of committing felony voter fraud.  Despite these warnings, Defendants intentionally accused people like Ms. Freeman and others of committing felonies by registering to vote and voting.

34.     On information and belief, critical media reports made Defendants further aware of the methodological shortcomings in *Alien Invasion I* after its release.[10]  Virginia election officials also informed Defendants of the methodological deficiencies of *Alien Invasion I* before *Alien Invasion II* was published.  *See* Ex. B, at 10.

**Despite Notice of the Flaws in their Approach, Defendants Continued Their Defamation and Intimidation Campaign By Publishing *Alien Invasion II***

35.     Less than one year after publishing *Alien Invasion I*, Defendants continued their campaign of defamation and intimidation with the publication of *Alien Invasion II* in May of 2017.[11]  As the name suggests, *Alien Invasion II* was intended to be a sequel to *Alien Invasion I.*

36.     Again, Defendants worked to publicize *Alien Invasion II* to national media via press releases and postings on Facebook and Twitter.  Media outlets again further

---

[10] *See* Peter Galuszka, *An Alien Invasion in the Old Dominion*, WASHINGTON POST (Oct. 10, 2016), https://www.washingtonpost.com/blogs/all-opinions-are-local/wp/2016/10/06/an-alien-invasion-in-the-old-dominion/?utm_term=.9aa4b72108fa.

[11] The report is available online at https://publicinterestlegal.org/files/Alien-Invasion-II-FINAL.pdf (last accessed April 11, 2018).

12

disseminated the report's assertions to a broad audience.[12]

37.     PILF and VVA were the named authors of *Alien Invasion II*.  Defendants conspired and worked in concert with each other and with VVA to develop and publish this second defamatory report.  On information and belief, Defendant Adams participated in the drafting of the report.  Defendant Adams again participated in the publication and dissemination of the report.

38.     *Alien Invasion II* affirmatively reiterates the accusation in *Alien Invasion I* that certain voters in a number of Virginia jurisdictions, including the Richmond area (where Plaintiff LULAC operates), were guilty of committing one felony by registering to vote and likely guilty of committing another felony by actually voting:

> Ex. B, at 6 ("**Among the records uncovered at Ms. Leider's office was a list of registrants who had been removed from the voter rolls because they were determined to not be U.S. citizens.**" (bold in original)); Ex. B, at 6 ("**Prince William County provided a list of 433 noncitizens who had registered to vote in the county, but were then removed after they were determined to not be U.S. citizens**. . . . **The Department of Justice so far has done nothing about the *felonies committed* by 433 suspected aliens registered in Prince William County alone.**" (italics added, bold in original)); Ex. B, at 7 ("Bedford County provided a list of 35 non-citizens that had been removed from the voter rolls."); Ex. B, at 7 (noting the discovery of "**list of 22 alien registrants**" in Roanoke (bold in original)); *see also* Ex. B, at 1 ("[*Alien Invasion I*]

---

[12] *See, e.g.*, Brandon Darby, *Watchdog Claims 5K Noncitizens Registered to Vote in Virginia*, BREITBART NEWS (May 30, 2017), http://www.breitbart.com/texas/2017/05/30/5k-noncitizens-registered-vote-virginia-report-finds/.

revealed that in these eight Virginia localities more than 1,000 non-citizens had recently been removed from the voter rolls.  In this small sample, nearly 200 verified ballots were cast prior to official removal.  *Each one of them is likely a felony*." (emphasis added)).

39.     *Alien Invasion II* was released in the wake of President Trump's unsupported allegations of massive voter fraud in the 2016 elections and the May 11, 2017, establishment of the Presidential Advisory Commission on Election Integrity—developments that Defendants might have expected to amplify the impact of their defamatory publication.

40.     *Alien Invasion II* alleges that 5,500 illegal registrations in Virginia resulted in 7,474 "Votes Cast By Non-Citizens" in recent Virginia elections.  *See* Ex. B, at 2.  The report imputes to each of those allegedly illegally registered individuals the commission of multiple felonies.  Ex. B, at 3 ("When non-citizens register or actually vote, they violate both state and federal statutes because citizenship is a requirement to vote in both state and federal elections."); Ex. B, at 12 ("Each time an alien registers a crime is committed."); Ex. B, at 15 ("**Over 1,100 non-citizens were discovered on the voter rolls in Fairfax County.  These individuals cast over 1,000 ballots before they could be removed from the rolls**. . . . It makes no difference whether alien votes were cast as a result of confusion or on purpose. *Each is a felony* . . ." (italics added, bold in original)).

41.     *Alien Invasion II* was published along with a roughly eight-hundred-page appendix containing voter registration forms, which included the names, home addresses, and telephone numbers of the alleged felons.  The published appendix originally included several voter registration forms with social security numbers before Defendants redacted that information.

42.     Plaintiffs' names, home addresses, and telephone numbers were included in the exhibits to *Alien Invasion II*.  *See* Ex. D (containing the pages from the report's Exhibit 1, which lists Luciania Freeman (at page 258) and Eliud Bonilla (at page 100), and from the report's Exhibit 12, which lists Jeanne Rosen (at page 48), Abby Jo Gearhart (at page 96-97[13]), Eliud Bonilla (at page 217), and Luciania Freeman (at page 831)).

43.     Subsequently, Defendants published a revised version of the appendix to *Alien Invasion II*, with a self-serving and dubious explanatory footnote stating that "Exhibit 12 was updated after the discovery that some records were erroneously disclosed by the Commonwealth of Virginia which reflected individuals incorrectly categorized in the official voter registration archive as being 'declared non-citizens'.  Those Records were removed." As a consequence, Plaintiffs Abby Jo Gearhart and Jeanne Rosen no longer appear as part of *Alien Invasion II* in the version of the report presently available on Defendant PILF's website.  However, Eliud Bonilla and Luciana Freeman continue to appear on pages 164 and 748 of the revised Exhibit 12, respectively, and continue to be defamed as non-citizens engaged in voter fraud.

44.     *Alien Invasion II* unequivocally accuses Plaintiffs of having committed a felony under federal and state law by improperly registering to vote and the clear implication of the report to an objectively reasonable reader is that Plaintiffs are also guilty of a second felony by actually voting.  In making such false accusations, Defendants have acted to intimidate or threaten Plaintiffs for registering to vote and voting.

---

[13] Ms. Gearhart's registration uses her maiden name (Sharpe) and a name from a previous marriage (Focht).

45.     By labeling the individuals named in the report as non-citizens and felons with reckless disregard for the truth of those accusations, Defendants act to intimidate and threaten those individuals and to deter them from voting or registering to vote.  In a contemporaneous article, Defendant Adams advocates prosecuting the individuals named in the report for voter fraud:

> [The Public Interest Legal Foundation] obtained 700 pages of similar examples. . . All can be accessed by law enforcement personnel at this link. . . The [] report documents election *felonies piled on top of felonies*.
>
> Federal law 52 U.S.C. Section 20511 makes it a felony to submit a false voter registration form.  Federal law 18 U.S.C. Section 1015 makes it a crime to make a false statement to register to vote.  Federal law 18 U.S.C. Section 611 makes it illegal for foreigners to cast a ballot.  Virginia law also criminalizes the casting of an illegal ballot.
>
> So you may think there should have been hundreds, or even thousands, of voter fraud prosecutions in Virginia in the last few years.  Again, you'd be wrong.
>
> And it's not for a lack of information. . .
>
> . . .
>
> In another American age, when government records revealed that crimes were committed by the hundreds or thousands . . .everyone would have cared. . .
>
> Let's see what happens . . .
>
> Maybe, just maybe, those tasked with enforcing the law at the United States Department of Justice and county prosecutors will ignore the nonsense and click the links—where hundreds of pages of real evidence can be found.[14]

Plaintiffs' names and contact information were listed on those so-called "pages of real evidence."

---

[14] J. Christian Adams, *Alien Invasion: Thousands of Foreigners Registered to Vote (and Voting) in Virginia*, PJ MEDIA (May 30, 2017) (emphasis added), https://pjmedia.com/jchristianadams/2017/05/30/alien-invasion-thousands-of-foreigners-registered-to-vote-and-voting-in-virginia/.

## Defendants' Felony Accusations Are False

46.     Defendants' felony accusations are false.  The lists provided by the county registrars do not establish that any particular voter is actually a non-citizen (and by implication guilty of committing a felony).  The lists simply establish that certain voters were removed from the voting rolls, which Defendants know can occur for various reasons—including accidental failures to respond to government inquiries or routine paperwork errors.  Subsequent media reports also noted that Virginia's election commissioner (as well as certain voters who themselves had been accused of felonies) vigorously disputed the accusations.  In response to a state legislator's inquiry about *Alien Invasion II*, Virginia Commissioner of Elections Edgardo Cortes stated that "[n]othing in this process necessarily confirms non-citizenship – only that inconsistent information has been provided," and that Adams and the Public Interest Legal Foundation "were uninterested in the context [and] had their own narrative they wanted to tell."[15]

47.     In fact, Plaintiffs are United States citizens.  They are therefore factually innocent of the false charges of felony voter fraud leveled by Defendants in the *Alien Invasion* reports.

## Defendants' False Accusations Have Imposed Substantial Harms on Plaintiffs and Interfered with Plaintiffs' Civil Rights

48.     Plaintiffs have suffered and continue to suffer various and extensive injuries because of Defendants' actions.  Each Plaintiff has been falsely accused of having committed one or more felonies by registering to vote and actually voting as alleged non-citizens.  Each

---

[15] *See* Jane C. Timm, *Vote Fraud Crusader J. Christian Adams Sparks Outrage,* NBC NEWS (Aug. 27, 2017), https://www.nbcnews.com/politics/donald-trump/vote-fraud-crusader-j-christian-adams-sparks-outrage-n796026.

Plaintiff has been subjected to adverse publicity on a national level; various media reported on the "*Alien Invasion*" reports and provided internet links to PILF's website and/or to the reports and their appendices, which contained sensitive contact information for Plaintiffs and are still largely accessible online.  This embarrassment and harm to their reputation—having been wrongly accused of committing felonies—was compounded when Defendant Adams ensured that the report and its appendices (including Plaintiffs' names) were made a part of the record of the Presidential Commission, which received extensive national press coverage.

49.     Plaintiffs have been and continue to be intimidated and threatened by Defendants' campaign of defamation.  In addition to the embarrassment and reputational harm that they have already suffered, Plaintiffs fear that the defamatory material will lead to a variety of adverse effects.  For example, Plaintiff Bonilla, who considered running for public office one day, fears and expects that the fact that his name is a part of a public record wrongly accusing him of being a non-citizen and having committed felonies, will subject him to "birther" conspiracies like the ones that plagued President Barack Obama.  He also worries about the potential impact the publication of this erroneous information could have on his family.  These accusations may deter him from exercising his right to run for public office.  As a further example, Plaintiff Freeman fears for her physical safety because she has been accused of illegal voting and her name and contact information are publicly available.  She also fears that her current or future employer could take adverse action against her because she has been falsely accused of a crime.  She fears that, if someone could erroneously include her name and personal information in a report accusing her of committing crimes, then authorities relying on the same publication could arrest or prosecute her based on mistaken beliefs about her citizenship.  Plaintiff Rosen feared that her right to vote would be disputed

18

when she reported to vote in the 2017 general election as a result of being listed in Defendants' report and continues to fear that inclusion in the report will permanently affect her ability to vote and have her votes counted in the future.  Likewise, Plaintiff Gearhart has been intimidated by the false accusations in the report.  Specifically, Plaintiff Gearhart fears her ability to vote may be challenged in the future and fears that she will be the target of harassment or violence.  Given the inclusion of her personal information in the report, Gearhart has chosen not to remove a home security system and has decreased her involvement in political activities.

50.     Plaintiffs have a legitimate concern regarding harassment and physical safety.  The reports were picked up by a number of media outlets which wrote articles that linked to the reports or to the PILF website.  The comment sections to those articles contained numerous threatening statements concerning those who were alleged to have fraudulently registered to vote or voted, with commenters, for example, calling for people to be "shot," "executed," "deported," or "imprisoned." [16]



---

[16] Neil W. McCabe, *Illegal Foreign Voting in Virginia Covered Up By Soros-Backed Democratic Officials, Says Report*, BREITBART NEWS (Oct. 2, 2016), http://www.breitbart.com/big-government/2016/10/02/virginia-illegal-voting-fraud-coverup/.

19





51.     The *Alien Invasion* reports further incite the already-heated rhetoric and discrimination against Latino and immigrant communities.  Indeed, the comments to media articles on the *Alien Invasion* mix anti-immigration sentiments with views on the reports. Plaintiff LULAC has devoted and will continue to devote critical and limited organizational resources to ensuring that Latino voters are not deterred from participating in the electoral process.

20

## COUNT 1

### 42 U.S.C. § 1985(3)

52.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

herein.

53.     Plaintiffs bring a claim under the second clause of 42 U.S.C. § 1985(3), which

provides that:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; *if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy*; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, *the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.* (emphases added)

54.     Defendants conspired with each other and with VVA to knowingly accuse

constitutionally eligible voters, including Plaintiffs, of having committed felony voter fraud

with the purpose of intimidating those and other voters in an effort to prevent them from

voting or registering to vote.

55.     Defendants' publication of the *Alien Invasion* reports constituted substantial steps

in furtherance of that conspiracy.

56.     Defendants either knew or should have known at the time they published and publicized the reports that they were accusing multiple United States citizens who were constitutionally eligible voters, including Plaintiffs, of committing felony voter fraud.

57.     By advocating for the prosecution of the ostensibly "non-citizen" voters published in the *Alien Invasion* reports and suggesting they could risk severe penalties, including significant jail time, if they voted, Defendants hoped to deter these constitutionally eligible voters from voting in upcoming elections.

58.     Additionally, by publishing the names and contact information of these constitutionally eligible voters in the *Alien Invasion* reports—thereby making them available to "ballot security" activists to "monitor" their voting—and by heavily publicizing the report on TV, radio, and online media using incendiary rhetoric (including lamenting the failure of law enforcement official to prosecute any of the published "non-citizen" voters), Defendants aimed to foment public outrage in an effort to intimidate these voters.

59.     Defendants' multiyear, ongoing defamation campaign did intimidate Plaintiffs and would intimidate an objectively reasonable individual named in either of the *Alien Invasion* reports, and thereby discourage or prevent the named individual from either registering or attempting to vote, for fear of the repercussions of being publicly accused of a felony.

60.     Defendants maliciously persist in their efforts to continue publicizing the names and contact information of Plaintiffs and other voters, even after knowing that they have accused innocent voters of having committed voter fraud.

61.     Plaintiffs Eliud Bonilla, Luciania Freeman, Abby Jo Gearhart, and Jeanne Rosen, each of whom was constitutionally eligible to vote in Virginia, were injured and continue to

be injured by being wrongly accused as having committed multiple felonies and having their

contact information (including home addresses, email addresses, and phone numbers)

published.

62.     Defendants' campaign of defamation is calculated to cause and has caused

Plaintiffs to fear that the publication of false accusations and personally identifying

information will subject them to harassment, malicious prosecution, physical harm, or other

repercussions from people believing they have committed voter fraud.  For some, their names

continue to be associated with those accusations, so the harms persist.  Defendants' conduct

is aimed at deterring Plaintiffs from exercising their voting rights.

63.     Plaintiff LULAC has been and continues to be injured by Defendants' publication

of these reports.  LULAC's members and the Latino community LULAC represents have

been and continue to be intimidated and threatened by Defendants asserting that registering

to vote and/or voting constitutes an unlawful "alien invasion" that should be prosecuted.  The

Latino community, including members of LULAC, will be discouraged from participating in

the electoral process as a direct result of Defendants' conduct.

64.     Plaintiff LULAC has been and continues to be injured by Defendants' publication

of these reports because it impedes one of LULAC's core goals, the promotion of political

participation.  Instead of engaging in its ordinary course initiatives, LULAC must devote

time and resources to combat the false narrative that Latinos who vote are doing so illegally.

Voters in Latino communities are already subject to scorn and discrimination because of

heated rhetoric directed against Latino and immigrant communities.  For example, in the

recent 2017 Virginia gubernatorial election, the rampant propagation of derogatory

information and generalizations associating Latinos with gangs such as MS-13 or painting

them as criminals caused much despair and despondence amongst the Latino community in the larger Richmond area.  Similarly, the *Alien Invasion* reports, which falsely accused many Latino voters as being noncitizens who were guilty of committing voter fraud, created an environment that deters constitutionally eligible Latino voters from exercising their fundamental right to vote.

65.    LULAC expended substantial time and effort combatting this heated rhetoric, and was required to divert significant resources to combatting and remedying those harms.  For example, LULAC was the recipient of a two-year grant to improve Latino graduation rates in the Richmond community.  They had planned to begin implementing this program in local middle schools and high schools with high Latino populations at the beginning of the 2017 school year.  However, because LULAC had to redirect its resources to combat the heated rhetoric against Latinos as non-citizens or worse and amplify their Latino voter mobilization efforts, LULAC had to delay the start of this program until after 2017 elections.  As a result of this delay, LULAC is further behind in achieving their intended goals for the education initiative and is still continuing to play catch-up.

66.    Unless enjoined by the Court, Defendants, and those acting in concert with them, will continue to violate Section 1985(3) by continuing to conspire to publish and publicize their *Alien Invasion* reports that intimidate and attempt to intimidate constitutionally eligible voters by subjecting them to false felony accusations on the internet and in national media, and/or risk harm and harassment by voter protection vigilantes.

## COUNT 2

### Section 11(b) of the Voting Rights Act

67.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

68.     Section 11(b) of the Voting Rights Act provides that:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of Title 42.

52 U.S.C. § 10307.

69.     Defendants violated Section 11(b) of the Voting Rights Act by intentionally publishing and publicizing *Alien Invasion* and *Alien Invasion II* as part of a reckless, ongoing defamation campaign.

70.     The defamation campaign intimidated, threatened, or coerced, and/or attempted to intimidate, threaten, or coerce the constitutionally eligible voters recklessly and falsely accused of committing felony voter fraud in the *Alien Invasion I* and *Alien Invasion II* into refraining from engaging in future voting-related activities.  Defendants' accusations would intimidate an objectively reasonable individual named in either *Alien Invasion I* or *Alien Invasion II* and thereby discourage or prevent the named individual from either registering or attempting to vote regardless of whether that individual was constitutionally eligible to vote in Virginia.

71.     Through the continued publication of the defamatory reports, Defendants intimidate or attempt to intimidate Plaintiffs and others similarly situated from exercising

25

their constitutional right to register to vote and vote.  Defendants' conduct has instilled fear in Plaintiffs that they will not be able to successfully exercise their right to vote in the future, and/or that engaging in such voting activity will subject them to further false accusations, false prosecution, harassment, threats to safety, or economic hardship.

72.     As detailed above, Plaintiff LULAC has been and continues to be injured, both as an organization and as a representative of its membership and the Latino community in the Richmond area.

73.     Unless enjoined by the Court, Defendants will continue to violate Section 11(b) of the Voting Rights Act by continuing to publicize their *Alien Invasion* reports that intimidate or attempt to intimidate Plaintiffs and potential voters by implying that as a consequence of lawfully registering and/or voting, they will repeatedly face false felony accusations on the internet and the national news.

## COUNT 3

### Defamation

[Plaintiffs Bonilla, Freeman, Gearhart, and Rosen, only]

74.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

75.     Defendants published the *Alien Invasion I* and *Alien Invasion II* reports.  Those reports defame Plaintiffs by falsely asserting that Plaintiffs Eliud Bonilla, Luciania Freeman, Abby Jo Gearhart, and Jeanne Rosen were non-citizens who committed felony voter fraud by registering to vote and/or voting.  *See, e.g.*, Ex. B, at 13 & n.69 ("For the remaining 702 non-citizen registrants, getting on the voter rolls was as easy as checking "yes" to the citizenship question . . . . The voter registration applications are produced at Exhibit 12"); Ex. D

26

(containing the registration forms from *Alien Invasion II*'s Exhibit 12, which lists Jeanne

Rosen (at page 48 of Exhibit 12), Abby Jo Gearhart (at pages 96-97), Eliud Bonilla (at page

217), and Luciania Freeman  (at page 831); Ex. B, at 12 ("Non-citizen registration and voting

matters. Each time an alien registers a crime is committed.  **When an alien votes** . . .

**another crime** [is] **committed**." (bold in original)); Ex. B, at 2 ("Simply put, it is a felony

for a non-citizen to register and to cast a ballot.  Each time such a crime is perpetrated . . ."));

Ex. B, at 3 ("When non-citizens register or actually vote, they violate both state and federal

statutes . . ."); Ex. B, at 5 & n.5 ("**The numbers are alarming: 5,556 non-citizens have**

**been removed from the voter rolls for citizenship problems** . . . . The cancellation reports

for all 120 counties are available at Exhibit 1 at the link provided on page 1 of this report."

(bold in original));  Ex. D (containing the pages from the report's Exhibit 1, which lists

Luciania Freeman (at page 258) and Eliud Bonilla (at page 100)); Ex. B, at 1 ("It is not

unreasonable to conclude that the full, and unknown, extent of non-citizens registered to vote

far exceeds the 5,500-plus who were removed."); Ex. B, at 1 ("**Despite obstruction from**

**local and state officials, the Public Interest Legal Foundation (PILF) expanded the non-**

**citizen investigation to the entire Commonwealth.  As a result, the number of**

**registrants removed from voter rolls for citizenship problems during the last few**

**election cycles grew to over 5,500. Of these *illegal registrants*, 1,852 cast nearly 7,500**

**ballots in elections dating back to 1988**." (italics added, bold in original)); Ex. B, at 15

("The accidental discovery of over 5,500 non-citizens . . . "); Ex. B, at 6 & n.32 ("**Prince**

**William County provided a list of 433 noncitizens who had registered to vote in the**

**county, but were then removed after they were determined to not be U.S. citizens** . . . .

An updated cancellation report subsequently received from the Department of Elections lists

the "Declared Non-Citizen Total" as 443.  See Exhibit 1." (bold in original)); Ex. B, at 6

("**The Department of Justice so far has done nothing about the felonies committed by**

**433 suspected aliens registered in Prince William County alone.**" (bold in original)); Ex.

B, at 13 ("The Fairfax County board had discovered 278 registered voters who had

represented to the DMV that they were not U.S. citizens.  **Almost half of them—117—had**

**not only registered to vote, they had in fact voted in state and federal elections**.  The

Department of Justice never followed up, leaving nearly 300 gift-wrapped cases of voter

fraud untouched." (bold in original)); Ex. B, at 15 ("**Over 1,100 non-citizens were**

**discovered on the voter rolls in Fairfax County.  These individuals cast over 1,000**

**ballots before they could be removed from the rolls**." (bold in original)); Ex. B, at 1 & n.1

("In October 2016, looking at data from only eight Virginia counties, we uncovered proof

that large numbers of ineligible aliens are registering to vote and casting ballots. Our

investigation revealed that in these eight Virginia localities more than 1,000 non-citizens had

recently been removed from the voter rolls.  In this small sample, nearly 200 verified ballots

were cast prior to official removal.  Each one of them is likely a felony. . . .

https://publicinterestlegal.org/blog/reportineligible-aliens-registering-vote-casting-ballots/.")

Ex. A, at 2 ("*[W]e found 1046 aliens who registered to vote illegally*." (emphasis in

original)); Ex. A, at 8 ("**The United States Attorney in Virginia has done nothing about**

**the felonies committed by 433 aliens registering in Prince William County alone**." (bold

in original)); Ex. C (containing the pages from the report's Exhibits 1 and 7 which lists Ms.

Freeman).

        76.     Those reports are false statements of fact and are defamatory per se because they

falsely impute to Plaintiffs the commission of crimes of moral turpitude.  Plaintiffs Eliud

Bonilla, Luciania Freeman, Abby Jo Gearhart, and Jeanne Rosen are United States citizens that are, or were, constitutionally eligible to vote in Virginia when they voted in Virginia.

77.     Plaintiffs Eliud Bonilla, Luciania Freeman, Abby Jo Gearhart, and Jeanne Rosen are private citizens and are not public figures or limited public figures.

78.     Defendants' libelous statements were false when made, were made without regard to their truth or falsity, and were made for the purpose of and with the intent of damaging the reputation of Plaintiffs or with reckless disregard of their effect on the reputation of Plaintiffs.  Specifically, Defendants recklessly and maliciously failed to exercise due care and diligence before publishing the defamatory statements.  A failure to respond to a government notice from the registrar of voters and/or removal from the voting rolls establishes neither that someone is a non-citizen nor that they committed voter fraud.

79.     Defendants published the defamatory statements with actual malice because they acted with reckless disregard for the truth of whether plaintiffs had illegally registered to vote and/or illegally voted.

80.     Defendants' false statements have impeached, injured, and damaged Plaintiffs.

81.     As an actual and proximate cause of Defendants' conduct in making such false statements, Plaintiffs have sustained harm, including damages in an amount to be determined at trial.

82.     Unless enjoined by the Court, Defendants, and those acting in concert with them, will continue to publish the defamatory statements.

## **PRAYER FOR RELIEF**

Plaintiffs pray for relief as follows:

1. That the Court determine that it has jurisdiction over this action.

2.   That the Court declare that Defendants have violated 42 U.S.C. §1985(3).

3.   That the Court declare that the Defendants have violated Section 11(b) of the Voting

   Rights Act.

4.   That the Court declare that the Defendants have defamed the Plaintiffs in violation of

   Virginia law.

5.   That the Court award compensatory and consequential damages in an amount to be

   determined at trial to compensate the Plaintiffs for the injuries that they have suffered as

   a result of Defendants' unlawful conduct.

6.   That the Court award punitive damages as provided by law and as proved at trial to

   punish Defendants for the publication of defamatory statements with actual malice.

7.   That the Court award attorneys' fees and litigation costs to Plaintiffs' attorneys.

8.   That the Court enjoin Defendants and anyone acting in privity with the Defendants from

   further violations of the law.

9.   That the Court grant all other and further relief as it may deem necessary and appropriate.

## **JURY DEMAND**

Plaintiffs demand a jury trial of all issues so triable.  *See* Fed. R. Civ. P. 38.

Dated this 12th Day of April 2018.

  /s/ Anisa A. Somani
ANISA A. SOMANI (VSB No. 86103)
NICOLE M. CLEMINSHAW (VSB No. 92161)
GEOFFREY M. WYATT (*Pro hac vice* forthcoming)
SEAN M. TEPE (*Pro hac vice* forthcoming)
LAUREN A. EISENBERG (*Pro hac vice* forthcoming)
SAMUEL LEVOR (*Pro hac vice* forthcoming)
ANDREW HANSON (*Pro hac vice* forthcoming)
1440 New York Ave. NW
Washington, DC 20005
Telephone:   (202) 371-7000
Facsimile:   (202) 661-8209
Anisa.Somani@probonolaw.com
Nicole.Cleminshaw@probonolaw.com
Geoffrey.Wyatt@probonolaw.com
Sean.Tepe@probonolaw.com
Lauren.Eisenberg@probonolaw.com
Sam.Levor@probonolaw.com
Andrew.Hanson@probonolaw.com
Zachary.Martin@probonolaw.com


ALLISON RIGGS (*Pro hac vice* forthcoming)
JACLYN MAFFETORE (*Pro hac vice* forthcoming)
**SOUTHERN COALITION FOR SOCIAL JUSTICE**
1415 West Highway 54, Suite 101
Durham, NC 27707
Telephone:   (919) 323-3380
Facsimile:   (919) 323-3942
AllisonRiggs@southerncoalition.org
JaclynMaffetore@southerncoalition.org

CAMERON KISTLER (*Pro hac vice* forthcoming)
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave., NW # 163
Washington, DC 20006
Telephone:   (202) 599-0466
Facsimile:   (929) 777-9428
cameron.kistler@protectdemocracy.org

LARRY SCHWARTZTOL (*Pro hac vice* forthcoming)
**PROTECT DEMOCRACY PROJECT**
10 Ware St.
Cambridge, MA 02138
Telephone:   (202)-599-0466
Facsimile:    (929)-777-9428
larry.schwartztol@protectdemocracy.org


ANDREW G. CELLI, JR. (*Pro hac vice* forthcoming)
ALANNA KAUFMAN (*Pro hac vice* forthcoming)
**EMERY CELLI BRINCKERHOFF & ABADY LLP**
600 Fifth Avenue at Rockefeller Center
10th Floor
New York, New York 10020
Telephone:   (212) 763-5000
Facsimile:    (212) 763-5001
acelli@ecbalaw.com
akaufman@ecbalaw.com


*Attorneys for Plaintiffs League of United Latin American Citizens –
Richmond Region Council 4614, Eliud Bonilla, Luciania Freeman, Abby
Jo Gearhart, and Jeanne Rosen*

**Exhibit A**



# PUBLIC INTEREST

## — LEGAL FOUNDATION —

# ALIEN INVASION IN VIRGINIA

## The discovery and coverup of noncitizen registration and voting

### VIRGINIA VOTERS ALLIANCE

September 30, 2016

> *"'The recount is almost over, and in this contest for attorney general … it's become apparent that our campaign is going to come up a few votes short,' Obenshain said, noting that he'd already called Herring to offer his congratulations. 'It was a vigorous and hard-fought campaign, but it's over.' Obenshain's concession will end a recount process that began on Nov. 5, when the two candidates were separated by a razor-thin election night margin.* **Herring defeated Obenshain by 165 votes out of more than 2.2 million votes cast***, according to results certified by the Virginia Virginia Department of Elections on Nov. 25."*

> - *Politico*, December 18, 2013, covering Republican Mark Obenshain's whisker thin loss in the Virginia Attorney General's race.

## *Only Americans Should Choose American Leaders*

Citizenship is the most fundamental element of eligibility to vote in American elections. Every state requires voters to be U.S. citizens to vote in state elections.[1]  The Virginia Constitution, specifically, delineates that "[e]ach voter shall be a citizen of the United States."[2] Only Americans should choose American leaders. Federal law makes it a crime for an alien to register to vote or to vote in a federal election. Simply put, it is a felony for a non-citizen to register and to cast a ballot.[3] Each time such a crime is perpetrated, whether by accident or willfully, a citizen is effectively disenfranchised.

The right to vote free from dilution by aliens is safeguarded primarily in several places—all of them appear to be failing to prevent aliens from participating in American elections and in the Commonwealth of Virginia. On the front end, federal law requires election officials to use reasonable efforts to identify and remove ineligible registrants from the voter rolls. The Federal voter registration form purports to prevent aliens from registering to vote, but it is an ineffective honor system under which the alien need merely lie to get on the voter rolls. On the back end, federal and state law enforcement officials are entrusted with prosecuting non-citizens who register and vote as a means to deter others from doing the same. Here too, the system is failing because the Obama administration has ignored instance after instance of voter fraud.

---

[1] See U.S. Dept. of Just., Federal Prosecution of Election Offenses 66 (7th ed. 2007), *available at* https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbook-rvs0807.pdf

[2] Va. Const., Art. II, Sec. 1.

[3] 18 U.S.C. § 1015(f). It is also a felony for an individual to simply "falsely and willfully represent[] himself to be a citizen of the United States." 18 U.S.C § 911.

1

In practice, none of these so-called safeguards is functioning correctly. Based on voting history records, large numbers of ineligible aliens are registering to vote and casting ballots.  They are canceling out the valid votes of American citizens. In some Virginia jurisdictions, the number of people registered to vote exceeds the number of citizens eligible to vote. When the Justice Department has been told of aliens registering to vote and committing federal felonies, nothing is done.

## *Summary of Findings*

An investigation in Virginia by the Public Interest Legal Foundation (PILF) and the Virginia Voter's Alliance (VVA) shows that the cause of this problem is something much worse than simple ineffective governance. Worse still, Virginia state election officials are obstructing access to public records that reveal the extent to which non-citizens are participating in our elections. These obstructionist tactics have led to PILF and VVA obtaining data from only a handful of Virginia counties so far. But the information from a few counties demonstrates a massive problem.

**In our small sample of just eight Virginia counties who responded to our public inspection requests,** *we found 1046 aliens who registered to vote illegally.*

The problem is most certainly exponentially worse because we have no data regarding aliens on the registration rolls for the other 125 Virginia localities. Even in this small sample, when the voting history of this small sample of alien registrants is examined, **nearly 200 verified ballots were cast before they were removed from the rolls. Each one of them is likely a felony.**

Again, this is from just a small sampling of Virginia counties. Each of the aliens we have discovered to have registered or voted has likely committed a felony. Will the Justice Department act now that their names, registration records and dates of voting are herein provided?

Ultimately, the number of illegal votes doesn't matter when the integrity of the process is at stake. Nobody should tolerate voter fraud, whether it comes in bunches as we describe here, happens occasionally, or decides the outcome of an election.  Lawlessness in elections is a precursor for lawlessness across our government and culture. The response of law enforcement officials to both single instances of voter fraud and the hundreds of examples documented in this report should be the same: swift, sure and unwavering. No excuses should be made for the lawless who taint the electoral process.

**The most alien votes were cast in 2012, followed by 2008, the year President Obama was elected to his first term.**

In Virginia, like most states, there is no formal program for identifying non-citizen registrants. The Commonwealth formerly arranged to use the Federal Systematic Alien Verification for Entitlements (SAVE) database to detect aliens, but vigorous

2

use seems to have ended during the administration of Governor Terry McAuliffe. Most discoveries of non-citizens on the registration rolls are accidental or chance. What this means is that the number of registered non-citizens thus far identified by this investigation is just the "tip of the iceberg." The true extent of the problem likely runs in the thousands, if not more. And it is not unique to Virginia.

There is plenty of blame to go around. One culprit, however, is glaringly obvious—federal and state voter registration forms, which ask registrants to affirm their citizenship with nothing more than the check of a box. No documentary proof of citizenship must be shown. It is nothing more than an honor system, one that is unquestionably failing to keep non-citizens from voting. States that have tried to remedy this problem by asking registrants to prove their citizenship with documentary proof have uniformly been stonewalled by litigation brought by our own Department of Justice and legions of attorneys working with left-leaning voter groups committed to keeping ineligible voters on the rolls.

This report demonstrates the serious problem that unelected election officials have refused to address and even conspired to hide. It is our hope that this report will result in swift change and restore confidence in our elections.

### *When an alien completes a voter registration form, they commit a felony.*

This report must begin with the relevant law. It is only with that in mind that the reader can comprehend the gravity of the problem Virginia and other states are facing when it comes to non-citizen participation in our elections. When non-citizens register or actually vote, they violate both state and federal statutes because citizenship is a requirement to vote in both state and federal elections.

The offenses a fraudulent voter might commit when he registers and votes are numerous:

- Virginia Code § 24.2-1004: Criminalizes casting an illegal ballot.

- Title 18, United States Code § 611: Criminalizes voting by illegal aliens in federal elections.

- Title 18, United States Code § 911: Criminalizes representing oneself to be a citizen of the United States.

- Title 18, United States Code § 1015: Criminalizes false statements in order to register to vote or to vote in any Federal, State, or local election.

- Title 52, United States Code § 20511: Criminalizes the fraudulent submission of voter registration applications and the fraudulent casting of ballots.

The United State Attorney General and the law enforcement officers in the Commonwealth of Virginia are, respectively, authorized to prosecute violations of all of these statutes. Given that the integrity of an election is where the consent of the governed is obtained, you would think that federal and state elections officials would treat these crimes with appropriate seriousness. As will be discussed later in this report, that is, however, not the case.

3

### *The National Voter Registration Act and the Help America Vote Act*

The problems in Virginia and other states can be traced as far back as 1993. Within months of assuming the Presidency, Bill Clinton signed into law the National Voter Registration Act ("NVRA")[4], a sweeping piece of legislation that proponents claimed would increase the number of registered voters and participation in our elections. One thing is for sure— it has increased the number of ineligible voters on state voter rolls.

The NVRA, commonly known as "Motor Voter," requires each state to offer voter registration to any individual that applies for a driver's license.[5] This provision of the law requires the applicant to swear to his or her citizenship under penalty of perjury,[6] but does not permit nor deny the state's ability to verify citizenship through formal documentation. Instead, the law provides that the states "may require only the minimum amount of information necessary to . . . enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."[7]

Attempts by various states to require registrants to provide documentary proof of citizenship during registration for federal elections have been thwarted by lawsuits brought by left-leaning voter groups and the Department of Justice. *Virginia therefore requires applicants to **merely check a box** in order to "prove" their citizenship status.*

The NVRA also allows individuals to register to vote through the mail using the federal voter registration form (the "Federal Form"), a document that is developed and maintained by a federal agency called the



Election Assistance Commission. In 2002, the Help America Vote Act added a citizenship question to the Federal Form.[8] Like Virginia's state registration form, the Federal Form requires only that a registrant check a box to "prove" his or her citizenship. Under the NVRA, state are required to "accept and use" the Federal Form for purposes of registration,[9] but the law does not prevent states from applying their own eligibility requirements.

---

[4] 52 U.S.C. § 20501 *et seq.*

[5] *See* 52 U.S.C. § 20504(a)(1) and (c)(1).

[6] 52 U.S.C. § 20504(c)(2)(C).

[7] 52 U.S.C. § 20504(c)(2)(B)(ii).

[8] 52 U.S.C. § 21083(b)(4)(A)(i).

[9] 52 U.S.C. § 20505(A)(1).

4

The NVRA also imposes voter list maintenance and record keeping obligations. The law does not contain of checklist of required actions, but rather states generally that election officials must "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant or a change in the residence of the registrant."[10] What constitutes a "reasonable effort" is not provided by the statute, which has often made litigation necessary to enforce these list maintenance obligations.

Election officials must also "maintain for at least 2 years" and "make available for public inspection" "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."[11] Like the NVRA's list maintenance provision, the public inspection provision suffers from ambiguity, allowing election officials to deny access to records based on their unilateral determination that certain records are outside the scope of the statute. In one such example, the nonprofit organization Project Vote endured three years of litigation simply to obtain copies of completed voter registration applications requested from the General Registrar of Norfolk, Virginia— records which the Fourth Circuit Court of Appeals ruled were "unmistakably" within the scope of records that election officials must make publicly available for inspection.[12]

PILF has filed four separate lawsuits in 2016 alone to force election officials to allow inspection of their election records. **In Virginia, election officials have opposed transparency and many Virginia counties are not in compliance with federal law regarding our requests and may yet be sued in federal court to obtain requested records.**

The NVRA authorizes the federal Attorney General to enforce the NVRA's mandates, including the statute's list maintenance and public inspection provisions.[13] However, this grant of authority has been sparingly used during the Obama years because officials within the enforcing agency— the Department of Justice Civil Rights Division—are ideologically opposed to enforcing this federal law. Justice Department officials are aware of corrupted voter rolls, but their politics prevent them from doing the right thing.

---

[10] 52 U.S.C. § 20507(a)(4).

[11] 52 U.S.C. § 20507(i).

[12] *Project Vote / Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012).

[13] 52 U.S.C. § 20510(a).

5

## *Obstruction Begins in Alexandria*

The effort to obscure the number of non-citizens who are registering and voting in Virginia began in the City of Alexandria.

In January 2016, the election integrity group Virginia Voter's Alliance (VVA) contacted Alexandria General Registrar Anna Leider, notifying her that based on implausible registration data, her office appeared to be in violation of the NVRA's mandate that she use reasonable efforts to remove ineligible registrants. **The letter additionally requested access to ten categories of records concerning Ms. Leider's list maintenance programs pursuant to the NVRA's public inspection provision.**

In April 2016, PILF, on behalf of VVA and David Norcross, a private Alexandria citizen, sued Ms. Leider under the NVRA's private right of action, alleging that her office violated the NVRA by refusing to provide inspection of election records and for failing to conduct reasonable list maintenance practices.

After a court hearing where Alexandria said it would make the requested records available, VVA then proceeded to visit Ms. Leider's office to inspect the city's records.

**Among the records uncovered at Ms. Leider's office was a list of registrants who had been purged from the voter rolls because they were determined to not be U.S. citizens.  The list includes hundreds of non-citizen registrants**, all of whom had likely committed felonies by registering to vote.

When VVA asked to photocopy the list, Ms. Leider refused, contradicting her statements made to the court. **Her refusal, however, was directed by state election officials. Ms. Leider's attorney later stated that she cannot provide the list because of "guidance" from the Virginia Department of Elections.** The excuse was that the reason for a registrant's cancellation—including by reason of non-citizen status—is confidential, and such information can neither be inspected nor duplicated.

A week later, and over eight months after the initial request was made, Ms. Leider finally capitulated. Her attorney provided VVA with a list, identifying **70 registrants who had been removed from Alexandria's registration lists after they were determined to not be U.S. citizens. These were just the aliens who were caught.**

Records showing the removal of ineligible non-citizen registrants are quintessentially records "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters,"[14] records that must be made available for public inspection under the NVRA. **Yet it took months of negotiations and a federal lawsuit to bring these records to the public's attention.**

---

[14] 52 U.S.C. § 20507(i).

6

Did any of the non-citizens removed from Alexandria's registration lists cast votes? Ms. Leider wouldn't tell PILF. According to her attorney, that information, too, is "confidential and available only for official use by the Department of Elections and general registrars." As discussed later in this report, some of these individuals have, in fact, participated in Virginia's elections.

## *The Virginia Alien Voter Cover-up Goes Statewide*

Alexandria is not the only jurisdiction that concealed the commission of felonies committed by non-citizen voters in Virginia. Upon the discovery of Alexandria's list of purged non-citizen registrants, **PILF utilized the NVRA's public inspection provision to request similar information from 19 Virginia counties and cities on August 8, 2016.  Nearly all of the counties have failed to comply with their federal obligation to provide transparent list maintenance records to us.**

Requests for a list of non-citizens purged from the voter lists since 2011 were made to the following Virginia counties and cities:

- **Arlington**
- **Albemarle**
- **Bedford**
- **Chesterfield**
- **Fairfax City**
- **Fauquier**
- **Frederick**
- **Falls Church**
- **Loudon**
- **Hampton**
- **Hanover**
- **James City**
- **Lancaster**
- **Manassas**
- **Prince William**
- **Roanoke**
- **Stafford**
- **Rappahannock**
- **York**

The election officials in charge of these jurisdictions were sometimes responsive, at first. **Prince William County provided a list of *433 non-citizens* who had registered to vote in the county, but were then removed after they were determined to not be U.S. citizens.**[15]

---

[15] See Exhibit 1. PILF notes that, on page 1, one registrant appears to be listed twice. However, on page 29, Prince William County lists the "Declared Non-Citizen Total" at 433 individuals.

The only indication that any of these potential felons were brought to attention of law enforcement is one communication provided by the county, which indicates that the United States Citizenship and Immigration Services contacted the county's general registrar requesting the voter registration application of one individual—    **REDACTED**    [16] The discovery was accomplished by chance and not a result of the county's own list maintenance. An additional communication shows that registration material for   REDACTED   , and one other individual, were then forwarded to the attorney for Prince William County. The communication notes that both individuals voted in the November 2012 General Election.

**The United States Attorney in Virginia has done nothing about the felonies committed by 433 aliens registering in Prince William County alone.**

**Bedford County**, a relatively small rural county in Virginia with only about 60,000 individuals of voting age, also provided a list of 35 non-citizens that had been removed from their voter rolls. Bedford County also provided copies of notices sent to 54 individuals who indicated on their DMV applications that they were not citizens. Upon learning that these individuals were not citizens, the county did not cancel their registrations. Rather, the county sent each individual a Notice of Intent to Cancel,[17] which informed the applicant that although they indicated they were not a citizen on their DMV application, their registration would remain active if they simply signed the notice, affirming they were a citizen. Based on the fact that only 35 non-citizens were removed between 2011 and the present, we can conclude that 19 individuals who swore under penalty of perjury to the DMV that they were not U.S. citizens returned the notice, stating they are a U.S. citizen. Like the initial check box used to register, the affirmation notice is nothing more than an honor system that easily allows non-citizens to remain registered to vote.

One week after providing the list of purged non-citizens, Barbara Gunter, the general registrar for Bedford County, contacted PILF by phone. The Virginia Department of Elections had since contacted Ms. Gunter and told her that she should not have provided us with the list because doing so violates federal law—the Federal Drivers Privacy Protection Act. She asked that PILF delete the list. Obviously we did not delete the list, and as we shall see, providing the records to the public obviously does not violate the federal law the Virginia Department of Elections used to strong-arm local election officials into noncompliance.

> We received no records showing that election officials had referred any non-citizen voters for investigation or prosecution.

**Roanoke County** acted similarly. After providing a list of **22 alien registrants**, General Registrar Judith Stokes emailed PILF, asking that we "destroy" the list she had previously provided.[18] Like Bedford County, Ms. Stokes explained that her request originated with the Department of Elections.

---

[16] See Exhibit 2.

[17] An example of this notice is provided in Exhibit 3.

[18] The email is reproduced in its entirety at Exhibit 4 to this report.

8

This is where production of records required to be released effectively stopped. Over the course of August and September 2016, responses from election officials rolled in, ***each one explaining that state election officials had instructed them not to provide lists of non-citizens*** who had been removed from Virginia's voter rolls.

The responses were nearly identical and soon it became clear that they were orchestrated by Edgardo Cortes, the Commissioner of the Virginia Department of Elections, and an appointee of Governor McAuliffe. According to numerous county election officials, Commissioner Cortes had issued guidance to them, instructing them not to respond to our requests for records pertaining to non-citizen voters.  Some election officials kindly provided us the original communications from Cortes.



The guidance from Commissioner Cortes included these instructions:[19]

> c.  ELECT is working on creating a single cancellation report that does not include the reason for cancellation and only releasable information to facilitate your response to these types of requests.  We will offer a statewide report to the requesting organization.  While there is a VERIS report that provides a list of registrants canceled due to non-citizenship for your administrative use, **you may not provide the information regarding reason for cancellation for non-citizen status** as this information is received from DMV and is covered under the federal Driver's Privacy Protection Act (DPPA).  The GR/EB Handbook already indicates that this information is not releasable.  The DPPA prohibits the release of covered data.  It is not sufficient to simply redact the reason code column from the current VERIS report since it contains only individuals identified by DMV as being potentially non-citizen and cancelled as a result.
>
> d.  The Department will not provide voting history as this is not covered under NVRA.  The Code of Virginia establishes who may obtain this information and how in 24.2-406.  Only the Department of Elections may provide this information to authorized individuals and entities.  We will notify the requestor of this fact and you should respond accordingly to this or any other request for voting history.

This is what a cover-up of alien voting looks like. State election officials are preventing public access not only to records showing the number of non-citizens who have successfully registered to vote, but also records showing how many of them voted prior to being removed from the registration rolls.

---

[19] The email is reproduced in its entirety at Exhibit 5 to this report.

9

Commissioner Cortes' guidance was distributed statewide on August 19, 2016. Yet not until September 16 did Commissioner Cortes contact PILF. In his correspondence, Commissioner Cortes offered to provide a "customized report" at a cost of $240,[20] a report that he claimed would satisfy our request concerning non-citizens. It wouldn't.

**Commission Cortes refused to provide a list of non-citizens who have been purged from the registration list in each jurisdiction.** He likewise refused to provide the voting history of purged non-citizens, reiterating his position that such information is not subject to release under the NVRA's public inspection provision, but is available only to "qualified entities" under limited circumstances.[21]

# *The Virginia State Board of Election's Excuses to Hide the Scope of Alien Registration*

### The Drivers Privacy Protect Act

According to the guidance issued to county election officials, Commissioner Cortes states that a list of registrants purged from Virginia's registration lists cannot be provided to the public because such information is protected from release by the federal Driver's Privacy Protection Act (DPPA). This is nonsense.

The DPPA makes it "unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted" by one of fourteen exceptions to the prohibition on disclosure.[22] According to Commissioner Cortes, neither general registrars nor the Department of Elections can disclose a list of registrations cancelled by election officials because, according to him, a registrant's citizenship status, as indicated on his driver's license application, is "personal information." Commissioner Cortes is plainly wrong for numerous reasons.

PILF seeks list maintenance records from election officials, not from any other state agency. The DPPA prohibits only the disclosure of "personal information" from a "motor vehicle record."[23] "Motor vehicle record" is defined by the law; it includes "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles."[24] Neither the registrant's citizenship status nor the reason for the registrant's cancelation is "personal information" under the DPPA.

---

[20] This cost was later waived after we informed Commissioner Cortes that the NVRA permits election officials to charge "reasonable costs" for "photocopying" only. 52 U.S.C. § 20507(i)(1). It does not permit election officials to impose costs for time spent producing records.

[21] The email is reproduced in its entirety at Exhibit 6 to this report.

[22] 18 U.S.C. § 2722(a).

[23] 18 U.S.C. § 2722(a).

[24] 18 U.S.C. § 2722(a).

The DPPA prohibits the disclosure of only "personal information" and highly restricted personal information."[25]   "Personal information" is defined by the law; it includes "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information."[26] "Highly restricted personal information" is "an individual's photograph or image, social security number, medical or disability information."[27]

List maintenance records pertaining to the removal of aliens from the rolls has nothing to do with a motor vehicle record or any protected personal information or highly restricted personal information.

### Voter History

Commission Cortes' guidance directed local election officials to conceal records showing the voting history of any individual whose registration was cancelled for reasons of citizenship. According to Commissioner Cortes, documents concerning voting activity are not covered under the NVRA's public inspection provision and can only be disclosed publicly as permitted by Commonwealth law, which permits disclosure, at a reasonable cost, only to a list of qualified entities.[28]

In the end, the State Board could not conceal the extent of alien voting because PILF and VVA worked with a third party with access to voter history to determine which of the aliens who registered to vote, actually voted.  Not surprisingly, many ballots were cast by these aliens.

# The Extent of the Non-citizen Registration in Virginia

Despite the cover-up orchestrated by state election officials, PILF was successful in procuring additional data concerning non-citizen voter registration in Virginia. It was, however, not easy. Federal law says it should be easy, but Virginia has a great deal to hide when it comes to alien registration and voting.

By way of dozens of phone calls and in-person visits to election offices, we were able to extract additional information from local registrars concerning non-citizen participation in Virginia's elections. Some officials, however, stood firm, refusing to provide us with the requested information. The information we have been able to gather thus far demonstrates what many of us already knew: **non-citizens are registering and voting in our elections.** The obstructionist effort led by state election officials has prevented us from learning how much deeper the problem runs.

---

[25] 18 U.S.C. § 2722(a).

[26] 18 U.S.C. § 2725(3).

[27] 18 U.S.C. § 2725(4).

[28] Va. Code Ann. § 24.2-406.

11

Below is the number of registrants per jurisdiction that have been removed from the voter rolls since, at most, 2011.



This data is but a minor snapshot of the problem. It represents non-citizen registrants in only 8 of Virginia's 133 voting jurisdictions and includes only those non-citizens that were discovered to have been improperly registered. Because no formal programs exist in Virginia to identify non-citizen registrants, the discovery and removal of these non-citizens is either by accident or because the registrant later indicated to election officials that he or she was not a citizen. The total number of non-citizens that remain registered to vote therefore cannot be completely ascertained. It is, however, likely, that based on discoveries to date, thousands of non-citizens remain registered and eligible to vote throughout the Commonwealth.

At the instruction of Commissioner Cortes, local election officials refused to provide us with records showing the voting history of non-citizens removed from registration lists.

In the 8 jurisdictions that provided us with lists of aliens recently removed from their voter rolls, **we discovered that 31 non-citizens had cast a total of 186 votes between 2005 and 2015. The most alien votes were cast in 2012 followed by 2008, the year President Obama was elected to his first term.**

The bill would have required the clerk of court to "make such information available to local elections officials so that they could cancel the registration of those individuals deemed ineligible to vote. The bill's purpose was clear: prevent ineligible residents from registering and voting in Virginia's elections. **Governor McAuliffe gave essentially no justification for his veto of this commonsense law, stating only that the issue needed "addition study."**[29]

---

[29] http://leg1.state.va.us/cgi-bin/legp504.exe?151+amd+HB1315AG.

12

It may be no accident that Commissioner Cortes had not done all he could when it comes to transparency about aliens voting in Virginia elections. Before he was picked by Governor McAuliffe, he worked at the Advancement Project, an organization strongly opposed to using citizenship verification tools such as the federal SAVE database.

PILF's request to local election officials asked for *all communications with federal and state law enforcement officials pertaining to non-citizens who had either registered to vote or voted.* **However, we received no records showing that election officials had referred any non-citizen voters for investigation or prosecution.** In fact, some jurisdictions indicated that they do not even review voter history to identify fraudulent votes. Like our other requests, this absence of records is due in part to the obstructionist efforts by Commissioner Cortes, whose guidance to local election officials informed them that communications with law enforcement officials were not records covered by NVRA and therefore did not need to be provided to PILF.

### *Systems Failure*: The Tradition of Ignoring Alien Voter Fraud in Virginia

The lack of action by the Department of Justice and law enforcement officials in Virginia is nothing new. In 2011, members of the Fairfax County Electoral Board alerted the Office of the U.S. Attorney for the Eastern District of Virginia in Alexandria, as well as the Public Integrity Section of the Criminal Division of the Justice Department (which coordinates election crime prosecutions) in Washington, of possible voter fraud by non-citizens.



*1: Source Virginia State Board of Elections election results website.*

The Fairfax County board had discovered 278 registered voters who had represented to the DMV that they were not U.S. citizens. Almost half of them—117—had not only registered to vote, they had in fact voted in state and federal elections. The Department of Justice never followed up, leaving nearly 300 gift-wrapped cases of voter fraud untouched.

*Systems Failure*: **Voter registration forms easily permit non-citizens to register and participate in our elections.**

The lack of prosecution of election crimes provides a key deterrent to voter fraud, if it is used. But the existing registration process provides non-citizens with an easy path to the ballot box. As previously explained, the federal voter registration form and the registration forms used by the Commonwealth of Virginia rely on nothing more than an honor system to limit voter registration to citizens of this country. In all cases, these forms include a checkbox at the top of the form, which asks registrants to answer "yes" or "no" to the question "Are you a citizen of the United States?" The registrant must additionally sign the form, under penalty of perjury, attesting to the fact that his or her answer to that question is true and correct. There are no other "safeguards" in place to protect the integrity of the registration process.

As the data demonstrates, this honor system has undeniably failed to prevent non-citizens from registering and voting. PILF's investigation requested that county election officials provide us with copies of voter registration forms used by the non-citizens those election officials later removed from voter rolls.

Prince William County, which provided a list of 433 non-citizens removed from its voter rolls since 2011, **provided us with those registration forms for non-citizens removed since 2015. These forms highlight the failures of our current registration process.**

Prince William County removed a total of 84 non-citizens from its voter rolls in 2015 and 2016.[30] **Of these registrants, 77 checked "yes" on their registration form, attesting, under penalty of perjury, that they were U.S. citizens.** Without any other confirmation, these individuals were registered to vote because Virginia is not using the SAVE database to check all incoming registrations for citizenship status.

However, a "yes" answer is not necessary to secure registration. **Four individuals actually answered "no" to the citizenship question but were registered to vote.**



**One registrant checked neither "yes" nor "no" but was still registered to vote.** The citizen checkbox on federal voter registration forms is failing to keep aliens off American voter rolls.

---

[30] The completed registration applications provided to PILF are available at Exhibit 7. The applications for at least two registrants were not provided by Prince William County.

14



Only two other jurisdictions, Fairfax City and Hanover County, complied with PILF's request to inspect voter registration application forms of the aliens who were detected. In Fairfax City, 20 non-citizens were removed from the rolls since 2011. Of those individuals who were registered to vote, 15 answered "yes" to the citizenship question, **3 answered "no,"** and 2 answered neither "yes" nor "no." In Hanover, which also provide 20 applications of purged non-citizens, 17 answered "yes" to the citizenship question, **2 answered "no,"** and 1 answered neither "yes" nor no."

The answer to this problem seems simple: **require all applicants to provide documentary proof of citizenship at the time of their registration.**

This obviously solution has, however, faced severe opposition by well-funded organizations and our own Department of Justice. Several states, including Alabama, Kansas, and Georgia have tried to safeguard their residents' right to vote by requiring all individuals to prove their citizenship prior to registering to vote.

Virginia Governor Terry McAuliffe is also doing his part to make voting by non-citizens even easier. In April 2015, Governor McAuliffe vetoed legislation[31] that would have required jury commissioners to retain information from individuals not qualified to serve as jurors for reasons that would also disqualify them from voting, such as

- not being a citizen of the United States
- no longer being a resident of the Commonwealth
- being a resident of another county or city in the Commonwealth
- having been convicted of a felony and having not provided evidence that their right to vote has been restored, or
- having been adjudicated incapacitated.

The bill would have required the clerk of court to "make such information available to local elections officials so that they could cancel the registration of those individuals deemed ineligible to vote. The bill's purpose was clear: prevent ineligible residents from registering and voting in Virginia's elections. Governor McAuliffe gave essentially no justification for his veto of this commonsense law, stating only that the issue needed "addition study."[32]

---

[31] House Bill 1315, available at http://leg1.state.va.us/cgi-bin/legp504.exe?151+ful+HB1315ER+pdf.

[32] http://leg1.state.va.us/cgi-bin/legp504.exe?151+amd+HB1315AG.

15

It is unlikely that this report, or any amount of evidence demonstrating the rampant election fraud taking place in Virginia, will convince Governor McAuliffe that additional safeguards to needed to protect the voting rights of his constituents.

## *Systems Failure*: Inviting Aliens to Stay on the Rolls

In one astonishing example, **one non-citizen was invited to remain on the voter rolls even after he had informed election officials he was an alien.** When **REDACTED** registered to vote in 2007, he checked "yes" in response to the application's citizenship question. In 2010, REDACTED renewed his driver's license and on his application, he checked "no" to the citizenship question. The inconsistencies in REDACTED 's answers alerted election officials that he might not be eligible to vote. His registration, however, was not canceled. Instead, REDACTED was mailed an "Affirmation of Citizenship," which asked REDACTED to affirm, subject to penalty of law, that he was a U.S. citizen. REDACTED signed the form and returned it. In May 2015, REDACTED 's voter registration was cancelled after election officials determined that he was, in fact, not a U.S. citizen.[33]

*What can be done?*

There are several changes that states and the federal government can and should make to prevent non-citizens from registering and voting illegally in state and federal elections:

- The registration process must be changed. The check-box honor system is a failure and is facilitating voter fraud. All states should require anyone who registers to vote to provide documentary proof of U.S. citizenship. In the alternative, states should fully utilize the federal SAVE database which contains the names of aliens who have had contact with the immigration system.

- Congress and state legislatures should require all federal and state courts to notify local election officials when individuals summoned for jury duty from voter registration rolls are excused because they are not United States citizens.

- State legislatures or state elections officials should enact requirements that force local election officials to conduct a systematic review of the voter history of all registrants who were purged from the rolls due to not meeting the requirements of U.S. citizenship.

- The database, known as E-Verify, that is being used by U.S. employers to check the citizenship status of prospective employees should be made available to election officials and administrators of statewide registration databases so that election officials can easily identify registered voters who are not U.S. citizens.

- Law enforcement at both the federal and state level should exercise their authority to prosecute cases of voter fraud. Voter registration and voting history records such as those contained in this report makes prosecution an easy task. Armed with that information,

---

[33] REDACTED 's registration applications are available at Exhibit 8.

16

prosecutors would simply have to verify whether or not the individual was a citizen at the time of registration or voting.

*Conclusion*

The problem is real and the solutions are simple. What is happening in Virginia is happening in every other state. Your vote is at risk and elected officials must act. You can help. Please contact your local election officials to ask what they are doing to ensure voter lists are accurate and free of ineligible voters.

17

**Exhibit B**



# Alien Invasion II

## THE SEQUEL TO THE DISCOVERY AND COVER-UP OF NON-CITIZEN REGISTRATION AND VOTING IN VIRGINIA

# PUBLIC INTEREST

## — LEGAL FOUNDATION —



May 2017

# Table of Contents

Introduction                                                01

The Stakes                                                  02

Summary of Findings                                         02

Felonies upon Felonies                                      03

Terry McAuliffe Is Working Against
Election Integrity                                          04

Sharing the Blame: Defects in the
National Voter Registration Act                             05

The Cover-up of Alien Registration
and Voting                                                  06

   Alexandria                                06

   The Cover-up Goes Statewide               06

   The Excuses for Hiding Information on
   Non-citizens                              08

The Extent of Non-citizen Registration
in Virginia                                                 09

   Alien Registration                        09

   Alien Voting                              10

Can Non-citizens Affect Election
Outcomes? Yes.                                              12

   Senate District 6                         12

   House District 87                         12

   Other Close Races                         12

Who Is to Blame for Non-citizen
Registration and Voting?                                    13

Virginia's Future: Why Action Is
Needed Right Now                                            15

   Virginia's Next Governor                  15

   House of Delegates                        15

   United States Senate                      15

   Local Elections                           15

Recommendations and Solutions                               16

Conclusion                                                  16

# Introduction

In October 2016, looking at data from only eight Virginia counties, we uncovered proof that large numbers of ineligible aliens are registering to vote and casting ballots. Our investigation[1] revealed that in these eight Virginia localities more than 1,000 non-citizens had recently been removed from the voter rolls. In this small sample, nearly 200 verified ballots were cast prior to official removal. Each one of them is likely a felony.



This report details the statewide problem of registered voters with citizenship problems in Virginia.

**Despite obstruction from local and state officials, the Public Interest Legal Foundation (PILF) expanded the non-citizen investigation to the entire Commonwealth. As a result, the number of registrants removed from voter rolls for citizenship problems during the last few election cycles grew to over 5,500. Of these illegal registrants, 1,852 cast nearly 7,500 ballots in elections dating back to 1988.**

This report details for policy makers, election officials and the general public the scope of the problem, the particular details for each county and the obstruction by government officials in obtaining this data.

Policy makers have a dual challenge—fixing the underlying problem of non-citizens easily registering to vote as well as the stubborn tendency of some election officials to hide and excuse this circumstance.

 Since our last investigation, the number of registrants removed from voter rolls for citizenship problems grew to over 5,500. Of these illegal registrants, 1,852 cast nearly 7,500 ballots in elections dating back to 1988.

Remember, the 5,500-plus registrants removed for citizenship problems are only those who were caught. They were caught by happenstance, usually by telling the motor vehicle agency they were not a citizen after previously telling the agency they were a citizen. It is not unreasonable to conclude that the full, and unknown, extent of non-citizens registered to vote far exceeds the 5,500-plus who were removed.

This is an especially sound conclusion when you consider that virtually nothing is being done to detect non-citizens on the voter rolls in Virginia. Worse, the Department of Elections and some local election officials did everything they could to hide the information, as we shall see below. Only after the Public Interest Legal Foundation filed multiple lawsuits in federal court, did state officials relent and provide the voter list maintenance records.

All of the raw data and records obtained in our research into alien registration and voting can be obtained at:

https://publicinterestlegal.org/alien-invasion-virginia/



# The Stakes

Citizenship is the most fundamental element of eligibility to vote in American elections. Every state requires voters to be U.S. citizens to vote in state elections.[2] The Virginia Constitution, specifically, delineates that "[e]ach voter shall be a citizen of the United States."[3]

The design is simple: **only Americans should choose American leaders.** Federal law makes it a crime for an alien to register to vote or to vote in a federal election. Simply put, it is a felony for a non-citizen to register and to cast a ballot.[4] Each time such a crime is perpetrated, by accident or willfully, a citizen is effectively disenfranchised.

The safeguards to prevent alien voter registration are failing. The Federal Voter Registration Form purports to prevent aliens from registering to vote. But it is an ineffective honor system under which the alien need merely lie to get on the voter rolls. Virginia's election officials could implement procedures to safeguard the system, but haven't for partisan reasons.

Even worse, federal and state law enforcement officials—who are entrusted with prosecuting non-citizens who register and vote as a means to deter others from doing the same—**have repeatedly done nothing when provided with solid evidence of non-citizen participation in the electoral system.**

> ✓ Every state requires voters to be U.S. citizens to vote in state elections.

In practice, none of the so-called safeguards are functioning correctly. **Based on voting history records, large numbers of ineligible aliens are registering to vote and casting ballots, sometimes for decades, before they are removed from the registration rolls.** They are cancelling out the valid votes of American citizens. Faced with this stark reality, Governor Terry McAuliffe has not only failed to act, he has repeatedly blocked legislation designed to help fix these problems.

# Summary of Findings

Obstructionist tactics by local and state election officials limited the scope of the October 2016 Alien Invasion report to six counties and two cities. We had asked the Virginia Department of Elections for the full list of registrants removed for citizenship problems but we did not receive it until we brought federal lawsuits against two Virginia election officials.

**Now we have a better picture of the extent of alien registration.  The numbers are alarming: 5,556 non-citizens have been removed from the voter rolls for citizenship problems in 120 of Virginia's 133 voting jurisdictions since 2011.[5] In 102 of these jurisdictions, 1,852 individuals cast 7,474 ballots before election officials cancelled their registrations. In the other 13 voting jurisdictions, election officials have not removed a single record from the voter rolls because of citizenship problems in over 6 years.**



5,556 — Non-citizen Registrations

7,474 — Votes Cast by Non-Citizens

In Virginia, like most states, there is no formal program for identifying non-citizen registrants. The Commonwealth formerly arranged to use the Federal Systematic Alien Verification for Entitlements (SAVE) database to detect aliens, **but vigorous use seems to have ended during the administration of Governor Terry McAuliffe.**

State election officials concede that most discoveries of non-citizens on the registration rolls are accidental or by chance. According to communications received from Edgardo Cortes, the Commissioner of the Virginia Department of Elections, the 5,556 non-citizens removed from the voter rolls in recent years were discovered only because they **"self-reported"** their status as a non-citizen to Commonwealth officials.[6]

# Felonies upon Felonies

In essence, the number of registered non-citizens in Virginia thus far identified by this investigation is just the "tip of the iceberg." According to 2016 United State Census estimates, there are approximately 474,000 voting age noncitizens in the Commonwealth.[7] Each of these individuals can make their way onto the voting rolls by simply checking the wrong box during a visit to the DMV. **The true extent of the problem likely runs in the tens of thousands, if not more.**

Ultimately, the number of illegal votes does not matter when the integrity of the process is at stake. No one should tolerate voter fraud, whether it comes in pockets as we describe here; happens occasionally; or decides the outcome of an election.

Lawlessness in elections is a precursor for the same across our government and culture. The response of law enforcement officials to both single instances of voter fraud and the hundreds of examples documented in this report should be the same: swift, sure and unwavering.



No one should tolerate voter fraud, whether it comes in pockets as we describe here; happens occasionally; or decides the outcome of an election.

There is plenty of blame to go around. One culprit, however, is glaringly obvious—federal and state voter registration forms, which ask registrants to affirm their citizenship with nothing more than the check of a box. **No documentary proof of citizenship must be shown.** This is nothing more than an honor system, one that is unquestionably failing to keep non-citizens from voting. Once the voter is registered, no additional checks are made about the citizenship status of the registrant. Easily obtained public information—such as jury recusal information showing persons who escape jury duty because they are not a citizen—is ignored.

This report demonstrates the serious problem that Governor McAuliffe and the Commonwealth's unelected officials have refused to address and even tried to hide. It is our hope that this report will result in swift changes that restore confidence in our elections.

When non-citizens register or actually vote, they violate both state and federal statutes because citizenship is a requirement to vote in both state and federal elections.

The offenses a fraudulent voter might commit when he registers and votes are numerous:

### Virginia Code § 24.2-1004

Criminalizes casting an illegal ballot.

### Title 18, United States Code § 611

Criminalizes voting by illegal aliens in federal elections.

### Title 18, United States Code § 911

Criminalizes representing oneself to be a United States citizen.

### Title 18, United States Code § 1015

Criminalizes false statements in order to register or vote in any Federal, State, or local election.

### Title 52, United States Code § 20511

Criminalizes the fraudulent submission of voter registration applications and the fraudulent casting of ballots.

The United States Attorney General and the law enforcement officers in the Commonwealth of Virginia are, respectively, authorized to prosecute violations of all of these statutes. Given that the integrity of an election is where the consent of the governed is obtained, you would think that federal and state election officials would treat these crimes with appropriate seriousness. As will be discussed later in this report, that is not the case.

# Terry McAuliffe Is Working Against Election Integrity

If anything, Virginia Governor Terry McAuliffe is consistent. With respect to voter integrity, McAuliffe has repeatedly vetoed legislation designed to protect the right to vote in the Commonwealth. Since 2015, McAuliffe, the former head of the Democratic National Committee, has vetoed a staggering eight bills passed by the Virginia legislature that would have strengthened election integrity.

At least two of these bills were designed to remedy the issue of non-citizen registration and voting identified in this report.

In April 2015, McAuliffe vetoed House Bill 1315,[8] which would have required jury commissioners to retain information from individuals not qualified to serve as jurors for reasons that would also disqualify them from voting, including status as a non-citizen or a felon. The bill required that this information be transmitted to election officials upon request.

The purpose of this bill was simple: provide reliable information to local election officials to allow them to detect non-citizens on the rolls. McAuliffe vetoed the bill, citing nothing more than his belief that "additional study" was needed.[9]

Governor McAuliffe also vetoed Senate Bill 1105.[10] It would have required local election officials to perform audits or investigations whenever voter rolls contain more registered voters than the number of individuals eligible to vote or when the number of votes exceeds the number of registered voters.[11]

In other words, the bill would have required an investigation when the voter rolls contain an <u>impossible</u> number of registrants or when an <u>impossible</u> number of votes were cast.



Since 2015, Governor McAuliffe has vetoed a staggering eight bills passed by the Virginia legislature that would have strengthened election integrity.

Corrupted voter rolls are not an imaginary problem. In 2015, PILF identified 141 counties across the nation that had more registered voters than living residents eligible to vote.[12] In 2016, we identified 37 more counties whose voter rolls contain either more registered voters than citizens eligible to vote, or a number of registrants that is nearing 100 percent of its citizen voting-age population.[13] Five of those counties are in Virginia.



Photo credit: Wikipedia Commons

2017 has been a banner year so far for Governor McAuliffe. In just 4 months, he has sent six election integrity bills to the scrap heap. Each of these bills was meant to remedy a specific vulnerability in Virginia's voting apparatus.


Provides resources to local election officials to identify voters registered in other states.[14 15]


Requires voter ID for voters using absentee ballots.[16 17 18 19]


Requires electronic pollbooks to include photo of voter.[20 21]


Criminalizes paying people to register to vote.[22 23]


Requires election officials to verify voter registration data using federal and state databases.[24 25]

# Sharing the Blame: Defects in the National Voter Registration Act

The problems with the voter rolls in Virginia and other states can be traced back to 1993. Within months of assuming the Presidency, Bill Clinton signed into law the National Voter Registration Act ("NVRA"),[26] a sweeping piece of legislation that proponents claimed would increase the number of registered voters and participation in our elections. One thing is for sure—defects in the legislation also increased the number of ineligible voters on state voter rolls.

The NVRA, commonly known as "Motor Voter," requires each state to offer voter registration to any individual that applies for a driver's license.[27] This provision of the law requires the applicant to swear to his or her citizenship under penalty of perjury,[28] but does not permit (nor deny) the state's ability to verify citizenship through formal documentation. Instead, the law provides that the states "may require only the minimum amount of information necessary to . . . enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."[29]



Photo credit: Wikipedia Commons

PILF filed lawsuits in four separate states in 2016 alone to force election officials to allow inspection of their election records. **When PILF set out to investigate non-citizen voting in Virginia, local and state election officials opposed transparency.** Many Virginia county election officials denied or even ignored our requests under the NVRA forcing us to file **three** separate lawsuits in federal courts to obtain the requested records.



Virginia requires applicants to merely check a box in order to "prove" their citizenship status.

Attempts by various states to require registrants to provide documentary proof of citizenship during registration for federal elections have been thwarted by lawsuits brought by left-leaning groups. Virginia therefore requires applicants to **merely check a box** in order to "prove" their citizenship status. This has proven to be inadequate.

Election officials must also "maintain for at least 2 years" and "make available for public inspection" "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."[30]

**Virginia Voter Registration Application**

*Starred (*) items are required.* If you do not complete all of the items that are marked w

1.
☐ YES  ☐ NO
* I am a citizen of the United States of America.

* Full social security number ☐ No SSN was ever issued.

Are you a citizen of the United States of America?     ☐ Yes  ☐ No
Will you be 18 years old on or before election day?     ☐ Yes  ☐ No
**If you checked "No" in response to either of these questions, do not complete form.**
(Please see state-specific instructions for rules regarding eligibility to register prior to age 18.)

# The Cover-up of Alien Registration and Voting

## Alexandria

The effort to obscure the number of non-citizens who are registering and voting in Virginia began in the City of Alexandria.

In January 2016, the election integrity group Virginia Voter's Alliance (VVA) contacted Alexandria General Registrar Anna Leider, **and requested access to public records concerning Ms. Leider's list maintenance programs pursuant to the NVRA's public inspection provision.**

In April 2016, PILF, on behalf of VVA and David Norcross, a private Alexandria citizen, sued Ms. Leider under the NVRA's private right of action, alleging that her office violated the NVRA by refusing to allow inspection of election records.[31]

After a court hearing where Alexandria said it would make the requested records available, VVA then proceeded to visit Ms. Leider's office to inspect the city's records.

**Among the records uncovered at Ms. Leider's office was a list of registrants who had been removed from the voter rolls because they were determined to not be U.S. citizens.  The list included hundreds of non-citizen registrants,** all of whom had likely committed felonies by registering to vote.

When VVA asked to photocopy the list, Ms. Leider refused. **Her refusal was directed by state election officials.**

A week later, and over eight months after the initial request was made, Ms. Leider finally capitulated. Her attorney provided VVA with a list, identifying **70 registrants who had been removed from Alexandria's registration lists after they were determined to not be U.S. citizens. These were just the aliens who were caught.**

Did any of the non-citizens removed from Alexandria's registration lists cast votes? Ms. Leider wouldn't tell PILF. PILF was told that information is "confidential and available only for official use by the Department of Elections and general registrars." As discussed later in this report, some of these individuals have, in fact, participated in Virginia's elections.

## The Cover-up Goes Statewide

Alexandria is not the only jurisdiction that concealed the commission of felonies committed by non-citizen voters in Virginia. Upon the discovery of Alexandria's list of registrants removed for citizenship problems, **PILF utilized the NVRA's public inspection provision to request similar information from 19 Virginia counties and cities on August 8, 2016.** The request went to:

- Arlington
- Albemarle
- Bedford
- Chesterfield
- Fairfax City
- Fauquier
- Frederick
- Falls Church
- Loudon
- Hampton
- Hanover
- James City
- Lancaster
- Manassas
- Prince William
- Roanoke
- Stafford
- Rappahannock
- York

The election officials in charge of these jurisdictions were sometimes responsive, at first. **Prince William County provided a list of 433 non-citizens who had registered to vote in the county, but were then removed after they were determined to not be U.S. citizens.**[32]

The only indication that any of these potential felons were brought to attention of law enforcement is one communication provided by the county, which indicated that the United States Citizenship and Immigration Services contacted the county's general registrar requesting the voter registration application of one individual— REDACTED REDACTED.[33] The discovery of REDACTED was accomplished by chance and not a result of the county's own list maintenance efforts.

An additional communication shows that registration material for REDACTED , and one other individual, were then forwarded to the attorney for Prince William County. The communication notes that both individuals voted in the November 2012 General Election.

**The Department of Justice so far has done nothing about the felonies committed by 433 suspected aliens registered in Prince William County alone.**

**Bedford County** provided a list of 35 non-citizens that had been removed from the voter rolls. Bedford County also provided copies of notices sent to 54 individuals who indicated on their DMV applications that they were not citizens. The county sent each individual a Notice of Intent to Cancel,[34] which informed the applicant that although they indicated they were not a citizen on their DMV application, their registration would remain active if they simply signed the notice, affirming they were a citizen.

Of the 54 suspected non-citizens, only 35 were removed. The remaining 19 individuals who had previously sworn under penalty of perjury to the DMV that they were not U.S. citizens returned the notice, stating they were a U.S. citizen and therefore stayed on the registration rolls. The affirmation notice is nothing more than an honor system that easily allows non-citizens to remain registered to vote, just like the initial citizenship checkbox on the voter form.

One week after providing the list of registrants removed for citizenship problems, Barbara Gunter, the general registrar for Bedford County, contacted PILF by phone. The Virginia Department of Elections contacted Ms. Gunter and told her that she should not have provided us with the list of removed voters because doing so violates the Federal Drivers Privacy Protection Act. She asked that PILF delete the list of previously provided public information. As we shall see, a federal court found no merit in the attempt to hide election records based on a federal highway law.

**Roanoke County** acted similarly. **After providing a list of 22 alien registrants, General Registrar Judith Stokes emailed PILF, asking that we "destroy" the list of removed registrants she had previously provided.**[35] Like Bedford County, Ms. Stokes explained that her request to destroy public election information originated with the Virginia Department of Elections.

After the Virginia Department of Elections pushed the meritless claim that federal highway law prevented us from seeing the list of those removed from the voter rolls for citizenship problems, the production of records by local officials effectively stopped. Over the course of August and September 2016, responses from election officials rolled in, **each one explaining that state election officials had instructed them not to provide lists of non-citizens who had been removed from Virginia's voter rolls.**



Edgardo Cortes, Commissioner, Department of Elections
Photo credit: Commonwealth of Virginia

This state-engineered stonewalling occurred on the eve of a federal election where the role of foreigners in the United States was a central issue in the Presidential race. Covering up the role of foreigners registering to vote did a disservice to a full and transparent debate of the issues.

Edgardo Cortes, the Commissioner of the Virginia Department of Elections, and an appointee of Governor McAuliffe, instructed local election officials to stonewall our requests for public information about alien voting with a legally meritless excuse. Numerous county election officials confirmed to PILF that Commissioner Cortes had issued guidance to them, instructing them not to respond to our requests for records pertaining to non-citizen voters. Some election officials kindly provided us the original communications from Cortes directing the stonewalling.

This is what a cover-up of alien voting looks like.

**State election officials prevented public access not only to records showing the number of non-citizens who have successfully registered to vote, but also records showing how many of them voted prior to being removed from the registration rolls.**



Commissioner Cortes' instructions to stonewall our requests for public election information was distributed statewide to local election officials on August 19, 2016.[36] Yet not until September 16 did Commissioner Cortes contact PILF. In his correspondence, Commissioner Cortes offered to provide a "customized report" at a cost of $240,[37] a report that he claimed would satisfy our request concerning non-citizens.  It didn't come close to responding to our requests detailing the names of aliens removed from the voter rolls for citizenship problems.

**Commission Cortes refused to provide a list of registered voters who have been removed from the registration rolls for citizenship problems in each jurisdiction.** He likewise refused to provide the voting history of registrants removed from the rolls for citizenship problems, reiterating his position that such information is not subject to release under the NVRA's public inspection provision, but is available only to "qualified entities" under limited circumstances.[38]

Cortes did not provide a list of registrants removed for citizenship problems across the Commonwealth until March 28, 2017, nearly eight months after PILF first made a broad request to counties on August 8, 2016. Cortes did this only after the United States District Court wholly rejected the flimsy excuse for failing to provide the data—that federal highway laws made it private.

# The Excuses for Hiding Information on Non-citizens

Commissioner Cortes told local election officials that a list of registrants removed from Virginia's registration lists for citizenship problems cannot be provided to the public because such information is protected from release by the federal Driver's Privacy Protection Act (DPPA). A federal court rejected this nonsensical excuse.

The DPPA makes it "unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted" by one of fourteen exceptions to the prohibition on disclosure.[39] The law has nothing to do with elections or election records. With no other recourse, PILF sued two defiant local election officials, Larry Haake, then-general registrar for Chesterfield County, and Susan Reed, general registrar for the City of Manassas.

Haake was unabashed about his non-compliance with PILF's request for registration records. During a public hearing before a joint session of the Privileges and Elections Committees of the Virginia General Assembly on October 13, 2016, at which PILF representatives were invited to speak, Haake testified that he deliberately did not provide PILF with the requested records. His defiance landed him in federal court.

Haake and Reed moved to dismiss PILF's lawsuits, arguing, at the behest of Commissioner Cortes, that the DPPA shielded their records from public disclosure. In a two-page decision, the federal court swiftly rejected this excuse, finding that "the DPPA does not apply to disclosure of the voter information requested by the Plaintiff."[40]

Haake did not take his defeat in stride. In an email written on the "official communication list for the General Registrars of the Commonwealth," Haake referred to Public Interest Legal Foundation attorneys as "lowlifes."[41] One month later, Haake announced he was retiring.[42]

With a court order in hand, PILF renewed its request to the State Department of Elections for non-citizen registration records for all 133 of Virginia's voting jurisdictions. A week later, Commissioner Cortes provided the data.

> In an email written on the "official communication list for the General Registrars of the Commonwealth," Haake referred to Public Interest Legal Foundation attorneys as "lowlifes."

Commissioner Cortes' guidance also directed local election officials to conceal records showing the voting history of any individual whose registration was cancelled for citizenship reasons. According to Commissioner Cortes, documents concerning voting activity are not covered under the NVRA's public inspection provision and can only be disclosed publicly as permitted by Commonwealth law, which permits disclosure, at a reasonable cost, only to a list of qualified entities.[43]

In the end, the state officials could not conceal the extent of alien voting because PILF and VVA worked with a third party with access to voter history to determine which of the aliens who registered to vote, actually voted.  Not surprisingly, many ballots were cast by these aliens.

# The Extent of Non-citizen Registration in Virginia

After eight months of phones calls, election office visits, and federal litigation, PILF has obtained records showing the currently-accounted-for extent of non-citizen registration and voting in Virginia. It was, not easy, despite the fact that federal law requires significant levels of transparency from election officials.

The information we have been able to gather demonstrates what many of us already knew: **non-citizens are registering and voting in our elections.** The obstructionist effort led by state election officials prevented PILF from obtaining this information prior to the 2016 election.

## Alien Registration

In total, 5,556 registrants were removed from the voter rolls for citizenship problems since 2011 in 120 voting jurisdictions. These were only the registrants with citizenship problems who were caught providing conflicting answers to state officials regarding their citizenship status. They swore they were citizens on voter registration forms, then later told the state they were not citizens, sometimes after many years of voting in elections.

Yet, in 13 jurisdictions, not a single non-citizen has been removed in over 6 years. Below are the totals for the top 20 offending jurisdictions. The data for the remaining jurisdictions is available at Exhibit 1 at the link provided on page 1 of this report.

This data is but a snapshot of the problem. **Because no formal programs exist in Virginia to identify non-citizen registrants, the discovery and removal of these non-citizens is either by accident or because the registrant later indicated to election officials that he or she was not a U.S. citizen.** The total number of non-citizens that remain registered to vote therefore cannot be completely ascertained. However, it is estimated that approximately 474,000 non-citizens of voting age reside in Virginia. It is highly likely, that based on discoveries to date, thousands of non-citizens remain registered and able to vote throughout the Commonwealth.

The institutions that should be asking the questions about the full extent of the problem—election officials, law enforcement, and the media—aren't even asking.  More often, they are denying the problem exists.

Recall that in 2015, Governor McAuliffe vetoed legislation[44] that would have allowed local election officials to obtain information concerning individuals who recused themselves from jury duty due to their status as non-citizens. Such individuals are ineligible to vote and their registrations should be cancelled. Governor McAuliffe's veto prevented that from happening.



### Top 20 Jurisdictions for Non-citizen Registrants



In one astonishing example of bureaucratic indifference—deliberate or otherwise—election officials registered an individual to vote who told election officials she resided at a foreign address.

According to records provided by state officials, **REDACTED**, whose Prince William County registration was cancelled in 2012 for citizenship problems, provided a Guatemalan address on her voter registration application.[45] **REDACTED** voted in 14 different elections—most recently in 2008—before her registration was canceled.

> REDACTED .
>
> REDACTED



Linda Lindberg, General Registrar, Arlington
Photo credit: County of Arlington

Finally, communications by election officials demonstrated zeal to conceal defects in Virginia's list maintenance systems to an astonishing degree. Despite PILF never once mentioning the role of "illegal aliens" in list maintenance problems, Arlington County general registrar Linda Lindberg heard otherwise. In a January 31, 2017 email we obtained, Lindberg fretted about the ramifications of PILF's courtroom success in obtaining the data contained in this report:

"This group [PILF] has and will interpret the fact that there may be voting credit on the cancelled record as "illegal aliens" registering and voting, despite the voter having subsequently affirmed his citizenship. (Although how they know these non-citizens are illegals is another story.)"[46]

Another story indeed—for PILF has never drawn any distinction between aliens and illegal aliens. Neither is entitled to vote. Lindberg's email is important for a second reason. Lindberg writes off this whole mess as a scrivener's error, where registrants are removed from the rolls for not being citizens, but later put back on the rolls once they affirm their citizenship by merely signing a form. Neither circumstance is very attractive.

Lindberg's alternative explanation is itself a serious problem with list maintenance in the Commonwealth. Legitimate voters should not be removed from the rolls for not being citizens. If this is how Lindberg explains the 5,500-plus instances of removal for citizenship defects, that circumstance is also appalling. Lindberg went further in her email, threatening to alter election records prior to providing them to PILF. Regarding some registrants removed from the rolls for citizenship problems, Lindberg suggested she might make those records vanish in the email:

"I am going to delete or otherwise notate these names from my report, either by deleting the rows from the Excel version or marking them on the report."[47]

In other words, for removed registrants that Lindberg thought might actually be citizens, she might "delete" them from the removal report. Even accepting Lindberg's premise that the removed registrants were really citizens, this would mean the public information provided by Lindberg would gloss over their potentially invalid removal from the rolls.

Lindberg's premise also has another problem. It simply might not be accurate. According to the Commissioner of the State Department of Elections, Edgardo Cortes, if a registration is cancelled for citizenship reasons, but the registrant subsequently affirms his citizenship, they will not appear on the cancellation reports. In an email to PILF attorneys, Cortes explains,

"If an individual was previously cancelled and then subsequently affirmed citizenship and was re-registered, they would no longer appear on this report because they would now be on active status."[48]

If that is true, Lindberg's alteration of election records would be even more troubling.

PILF's priority is that every eligible citizen remain on the rolls and every ineligible alien be removed from the rolls. Potentially deleting and altering public election records would conceal from view examples to the contrary. Election officials should be transparent, and in Virginia, transparency has been in short supply.

10

# AlienVoting

In 102 jurisdictions, we discovered that 1,852 non-citizens had cast a total of 7,474 votes between 1988 and 2016. The most alien votes, 1,065, were cast in 2008, the year President Obama was elected to his first term.[49]

Before Commissioner Cortes was picked by Governor McAuliffe, he worked at the Advancement Project, an organization strongly opposed to using citizenship verification tools such as the federal SAVE database.

PILF's request to local election officials asked for all communications with federal and state law enforcement officials pertaining to non-citizens who had either registered to vote or voted. However, to date, we have received no records showing that election officials had referred any non-citizen voters for investigation or prosecution. In fact, some jurisdictions indicated that they do not even review voter history to identify fraudulent votes. Like our other requests, this absence of records is due in part to the obstructionist efforts of Commissioner Cortes, whose guidance to local election officials informed them that communications with law enforcement officials were not records covered by NVRA and therefore did not need to be provided to PILF.

These circumstances raise serious questions as to whether the efforts to obscure the extent of alien participation in our elections are deliberate. Do various interests want the rolls to be polluted?

Virginia's use of absentee voting by mail only aggravates preexisting problems with the rolls. The people receiving mail ballots undergo essentially no scrutiny before their ballots are counted. As more and more states push for vote-by-mail options, lawmakers must also expand their efforts to keep the rolls free from ineligible registrants.





## Top 20 Counties for Non-citizen Votes

| County | Votes |
|---|---|
| Fairfax County (1018) | |
| Prince William County (523) | |
| Virginia Beach City (517) | |
| Richmond City (431) | |
| Norfolk City (348) | |
| Chesterfield County (292) | |
| Loudoun County (280) | |
| Newport News City (279) | |
| Chesapeake City (276) | |
| Stafford County (260) | |
| Hampton City (156) | |
| Hanover County (146) | |
| Alexandria City (141) | |
| Bedford County (135) | |
| Manassas City (123) | |
| Suffolk City (113) | |
| Roanoke City (102) | |
| Portsmouth City (92) | |
| Orange County (84) | |
| Franklin County (82) | |

# Can Non-citizens Affect Election Outcomes? Yes.

Non-citizen registration and voting matters. Each time an alien registers a crime is committed. **When an alien votes, not only is another crime committed, the vote of a U.S. citizen is effectively cancelled.** That alone should motivate elected officials to seek solutions to these problems.

The commission of felonies and disenfranchisement are not the only concerns. The number of non-citizens found on the voters rolls—a number that reflects only those non-citizens caught by chance—demonstrates that non-citizens can affect actual election outcomes, stripping Americans of their fundamental right to choose their own leaders.

Republican Mark Obenshain's razor-thin loss to Democrat Mark Herring in Virginia's 2013 Attorney General race is well known. At the time the election was certified, Herring defeated Obenshain by a mere 165 votes.[50] After a recount was conducted, Herring's margin of victory increased to 907 out of over 2.2 million votes cast.[51] With thousands of non-citizens registering to vote in Virginia, it is not unreasonable to consider that Herring's victory could very well have been aided by the votes of non-citizens.

Statewide races are not the only elections that matter. The lives of Virginians are greatly affected by the outcomes of a host of regional and local elections, ranging from House and Senate contests to elections for mayor, Commonwealth attorneys, and school board members.

A review of election results shows that a number of recent elections could have been swayed by non-citizen voters based on a comparison of the margin of victory to the number of non-citizens discovered on the rolls by chance.

## Senate District 6 (2014)

2014's Special Election for the Senate seat in District 6 was decided by just 9 votes out of over 20,000 votes cast.[52] Senate District 6 includes two jurisdictions with some of the largest instances of removals for citizenship problems in the Commonwealth. (Table, Top 20 Counties for Non-citizen Registrants, above). When the votes were tallied, Democrat Lynwood Wayne Lewis, Jr. defeated Republican Burwell Wayne Coleman.

## House District 87 (2011)

2011's House of Delegates election in District 87 was decided by 51 votes.[53] District 87 includes portions of Fairfax County, Loudoun County and Prince William County, jurisdictions that rank in the top 5 for number of non-citizens removed from the voter rolls since 2011.

## Other Close Races

Tight races are commonplace in the Commonwealth. The following are examples of recent elections where the margin of victory was small enough for non-citizen voters to potentially affect the outcome:

### 2011

School Board (Augusta - Beverly Manor) – 1 vote[54]
School Board (Rockingham - District 2) – 3 votes[55]
School Board (Spotsylvania - Livingston) – 21 votes[56]
School Board (Loudoun - Leesburg) – 85 votes[57]
Commonwealth Attorney (Richmond) – 53 votes[58]
Senate District 17 – 286 votes[59]

### 2012

Mayor – Herndon (Fairfax County) – 38 votes[60]

### 2013

House District 86 – 54 votes[61]
House District 87 – 187 votes[62]
House District 2 – 223 votes[63]
House District 31 – 228 votes[64]
House District 34 – 422 votes[65]

### 2015

Clerk of Court (Roanoke) – 37 votes[66]
House District 2 – 125 votes House[67]
District 87 – 320 votes[68]

# Who Is to Blame for Non-citizen Registration and Voting?

The evidence plainly demonstrates that Virginia's voter registration system is broken. But who is to blame? Well, there is plenty of blame to go around. The federal government, state election officials, and local general registrars all contribute to the problem and it is clear that real reform is needed at all levels to ensure voting in the Commonwealth is secure.

## ➲ System Failure: The Tradition of Ignoring Alien Voter Fraud in Virginia

In addition to asking local registrars to turn over data on non-citizen registration, we asked some officials whether they had referred any non-citizen registrants to law enforcement for investigation or prosecution. **We did not receive any documents indicating that even a single referral had been made.**

The absence of data on criminal referrals in other voting jurisdictions is due to the obstructionist efforts of Commissioner Cortes, whose guidance to local election officials informed them that communications with law enforcement officials were not records covered by NVRA and therefore did not need to be provided to PILF.

The lack of action by the Obama Department of Justice and law enforcement officials in Virginia is nothing new. In 2011, members of the Fairfax County Electoral Board alerted the Office of the U.S. Attorney for the Eastern District of Virginia in Alexandria, as well as the Public Integrity Section of the Criminal Division of the Justice Department (which coordinates election crime prosecutions) in Washington, of possible voter fraud by non-citizens.



We did not receive any documents indicating that even a single referral to law enforcement had been made.

The Fairfax County board had discovered 278 registered voters who had represented to the DMV that they were not U.S. citizens. **Almost half of them—117—had not only registered to vote, they had in fact voted in state and federal elections.** The Department of Justice never followed up, leaving nearly 300 gift-wrapped cases of voter fraud untouched.

## ➲ System Failure: Voter registration forms easily permit non-citizens to register and participate in our elections.

The lack of prosecution of election crimes provides a key deterrent to voter fraud, if it is used. But the existing registration process provides non-citizens with an easy path to the ballot box. As previously explained, the Federal Voter Registration Form and the registration forms used by the Commonwealth of Virginia rely on nothing more than an honor system to limit voter registration to citizens of this country.

In all cases, these forms include a checkbox at the top of the form, which asks registrants to answer "yes" or "no" to the question "Are you a citizen of the United States?" The registrant must additionally sign the form, under penalty of perjury, attesting to the fact that his or her answer to that question is true and correct. There are no other "safeguards" in place to protect the integrity of the registration process.

Our previous investigation demonstrated the undeniable failures of the current voter registration system. **In the three jurisdictions PILF was able to survey, it was revealed that election officials were registering non-citizens who left the check box blank or, even worse, answered "no" to the citizenship question.**

By way of repeated requests for documents, PILF obtained voter registration forms for 13 additional voting jurisdictions in Virginia. The results reveal that the check-box honor system is a failure across the board.

In the 16 jurisdictions surveyed, PILF reviewed 764 voter registration applications submitted by applicants who were later removed for lacking U.S. citizenship. **In this small sample, 43 non-citizens answered "no" to the citizenship question yet were registered to vote.** An additional 18 non-citizens left the citizenship question blank yet were registered to vote. One individual checked both boxes and was still registered to vote.

That means over 8 percent of the non-citizen registrations surveyed could have been caught at the time of registration if election officials simply paid closer attention.

For the remaining 702 non-citizen registrants, getting on the voter rolls was as easy as checking "yes" to the citizenship question.[69]

**"No"**

| 1 | *Are you a citizen of the United States of America? ☐ YES ☒ NO | *Will you be at least 18 years of age on or before the next General Election day? ☐ YES ☒ NO | If you checked "NO" in response to either of these questions, do not complete this form. |
|---|---|---|---|
| 2 | | ☒ Male ☐ Female   REDACTED | REDACTED |
| | *Social Security Number   REDACTED | *Gender REDACTED *Date of Birth REDACTED | Daytime Telephone Number |
| | | | ☐ None        ☐ None |
| 3 | *Last Name | *First Name | *Full Middle or Maiden Name *Suffix (Jr., Sr., III, Etc.) |
| | | REDACTED | |
| | *Residence (Permanent) Home Address | Apt/Unit/Lot/Rm/Ste   City/Town | Zip Code |

**Blank**

| 1 | *Are you a citizen of the United States of America? ☐ YES ☐ NO | *Will you be at least 18 years of age on or before the next General Election day? ☐ YES ☐ NO | If you checked "NO" in response to either of these questions, do not complete this form. |
|---|---|---|---|
| 2 | | ☐ Male ☐ Female   REDACTED | REDACTED |
| | *Social Security Number | *Gender *Date of Birth   REDACTED | Daytime Telephone Number |
| | | | ☐ None        ☐ None |
| 3 | *Last Name | *First Name   REDACTED | *Full Middle or Maiden Name *Suffix (Jr., Sr., III, Etc.) |
| | | REDACTED | |
| | *Residence (Permanent) Home Address | Apt/Unit/Lot/Rm/Ste   City/Town | Zip Code   REDACTED |
| | If Rural Address or Homeless, please describe where you reside | | E-mail address |

**Both**

| 1 | *Are you a citizen of the United States of America? ☒ YES ☐ NO | *Will you be at least 18 years of age on or before the next General Election day? ☒ YES ☐ NO | If you checked "NO" in response to either of these questions, do not complete this form. |
|---|---|---|---|
| 2 | | ☒ Male ☐ Female | |
| | *Social Security Number   REDACTED | *Gender *Date of Birth   REDACTED | Daytime Telephone Number   REDACTED |
| | | | ☐ None        ☒ None |
| 3 | *Last Name   REDACTED | *First Name   REDACTED | *Full Middle or Maiden Name *Suffix (Jr., Sr., III, Etc.)   REDACTED |
| | *Residence (Permanent) Home Address | Apt/Unit/Lot/Rm/Ste   City/Town | Zip Code |

## ⇒ System Failure: Inviting Aliens to Stay on the Voter Rolls

In one astonishing example, a non-citizen was invited to remain on the voter rolls even after he had informed election officials he was an alien. When REDACTED registered to vote in 2007, he checked "yes" in response to the application's citizenship question. In 2010, REDACTED renewed his driver's license and on his application, he checked "no" to the citizenship question.

The inconsistencies in REDACTED 's answers alerted election officials that he might not be eligible to vote. His registration, however, was not cancelled. Instead, REDACTED was mailed an "Affirmation of Citizenship," which asked REDACTED to affirm, subject to penalty of law, that he was a U.S. citizen. REDACTED signed the form and returned it. In May 2015, REDACTED 's voter registration was cancelled after election officials determined that he was, in fact, not a U.S. citizen.[70]

REDACTED 's situation is not unique. In fact, under Virginia law, any registered voter whose citizenship status is in question must receive a Notice of Intent to Cancel. The notice informs the registrant that his registration will be canceled unless he signs a form attesting that he is a U.S. citizen. In other words, even after election officials receive information indicating that a registrant is not a U.S. citizen, they must give the registrant another chance to mislead them. Even after red flags are raised, no proof of citizenship is required to finally clear the air. Like the registration form, the affirmation form is nothing more than an honor system that allows aliens to remain on the rolls.





14

# Virginia's Future: Why Action Is Needed Right Now

The accidental discovery of over 5,500 non-citizens suggests thousands more could remain registered and able to vote. With no real safeguards in place, it is a certainty that new alien voters are being added to the rolls month after month. With major elections looming in 2017, swift and sweeping changes must be made to ensure that only Americans are choosing American leaders.

## Virginia's Next Governor

Governor Terry McAuliffe has been one of the biggest obstacles to election integrity in Virginia. Fortunately, he is barred by law from seeking re-election. In November, Virginians will decide who will replace him. Election integrity is not a partisan issue. No matter what party an official is from, they take an oath to uphold the laws and defend the Constitution.

Virginia's next Governor should reverse the hostility toward clean elections of Governor McAuliffe. On the heels of our previous investigation, the Virginia House of Delegates passed legislation that would require new registrants to provide proof of U.S. citizenship in order to register to vote. A bill with similar requirements could land on the desk of Virginia's next governor.

Despite clear evidence that non-citizens are registering and voting in Virginia's elections, some are choosing to remain willfully ignorant. Delegate Mark. D. Sickles, a member of the House of Delegates who represents portions of Fairfax County told the media, "I think committing a felony to vote in an election is something that no non-citizen in their right mind would do."[71] **Over 1,100 non-citizens were discovered on the voter rolls in Fairfax County. These individuals cast over 1,000 ballots before they could be removed from the rolls.** Delegate Sickles won his most recent election in 2015 with 63 percent of the vote.[72]

It makes no difference whether alien votes were cast as a result of confusion or on purpose. Each is a felony and results in the disenfranchisement of a U.S. citizen.

For those who have truly cast votes because of the mistaken belief that they are eligible to vote, we must ask: why are we content with putting non-citizens in a position to accidentally commit felonies that could result in deportation? Better safeguards during the registration process— as opposed to a checkbox—would actually protect non-citizens. Like eligible U.S. citizens, non-citizens who register to vote are mailed confirmation cards that tell them where to vote.

The legislation requiring proof of citizenship would prevent non-citizens from joining the registry in the first instance, removing the possibility that non-citizens would be provided with a ballot sometime in the future.



## House of Delegates

Republicans currently control 66 of Virginia's 100 seats in the House of Delegates.[73] While all 100 seats are up for grabs in 2017, only 55 are contested.[74] Republicans currently hold a super-majority. As of April, Democrats are running 77 candidates in 49 House districts currently occupied by Republicans, including all 17 Republican-held districts that voted for Hillary Clinton in 2016.[75]

As detailed above, lawmakers have done their part to legislatively address vulnerabilities in Virginia's registration and voting system. Whether these efforts will continue in 2017 and beyond could depend on the outcome of Virginia's House of Delegates' contests.

## United States Senate

In November 2018, Virginians will elect one of their two representatives in the United States Senate. Incumbent Senator Tim Kaine, former candidate for Vice President, is running for re-election.[76]

The federal voter registration form is in need of change. Like Virginia, the federal form uses an honor system to verify U.S. citizenship. That system has failed. An act of Congress could and should require documentary proof of citizenship that would ensure only U.S. citizens are added to the voter rolls.

## Local Elections

In 2017 and beyond, Virginians will choose mayors, school board members, and city councilors. Virginians have a right to demand that their local election officials serve their public records with vigilance to ensure that representatives of the people are duly selected.

# Recommendations and Solutions

There are several changes that states and the federal government should make to prevent non-citizens from registering and voting illegally:

- ✓ The Virginia legislature could once again pass laws that protect elections from alien registration and voting. First, pass legislation that allows election officials to use all of the data available to county governments to detect aliens on the voter rolls, especially jury excusal forms, on which the registrants say under oath they are not citizens. Second, pass legislation requiring election officials to monitor and audit voter rolls that have reached implausible rates of registration that surpass the total eligible citizen population. Third, enact some form of citizenship verification.  Fourth, insist in the funding process that Commonwealth Attorneys take voter fraud seriously and prosecute election criminals.  Fifth, insist that the next governor appoint a director of elections that also takes voter fraud, alien voting, and transparency obligations seriously.

- ✓ The registration process must be changed. The check-box honor system is a failure and is facilitating voter fraud. All states should require voter applicants to provide documentary proof of U.S. citizenship. In the alternative, states should fully utilize the federal SAVE database which contains the names of aliens who have had contact with the immigration system.

- ✓ Election officials should ask federal and state courts to notify local election officials when individuals summoned for jury duty from voter registration rolls are excused because they are not United States citizens.

- ✓ State legislatures or elections officials should create and enforce requirements to conduct systematic reviews of the voter histories for all registrants who were purged from the rolls due to not meeting the requirements of U.S. citizenship.

- ✓ The database, known as E-Verify, that is being used by U.S. employers to check the citizenship status of prospective employees should be made available to election officials and administrators of statewide registration databases to better identify registered voters who are not U.S. citizens.

- ✓ The U.S. Department of Homeland Security should open new information-sharing channels between agencies to include Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), Citizenship and Immigration Services (USCIS) and Homeland Security Investigations (HSI) with state and local election officials to more easily identify non-citizens coming into contact with the federal immigration system.

- ✓ Law enforcement at both the federal and state level should exercise their authority to prosecute cases of voter fraud. Voter registration and voting history records such as those contained in this report make prosecution an easy task. Armed with that information, prosecutors would simply have to verify whether or not the individual was a citizen at the time of registration or voting.

# Conclusion

Our current election systems were largely conceived in a time when the concept of non-citizens being granted voter roll entry by official actors was unheard-of. Times change, but the commitment to election integrity must remain the same.

The problem is real and the solutions are simple. What is happening in Virginia is happening in every other state. Your vote is at risk and elected officials must act. You can make a difference. Your voting rights are not limited to Election Day. You have the right to question the quality of service that election officials are providing. Please contact your local officers to ask what they are doing to ensure voter lists are accurate and free of dead, duplicate, felon, fictitious, relocated, and non-citizen voters. Simply asking a question can inspire real reform.

# Endnotes

1 | https://publicinterestlegal.org/blog/report-ineligible-aliens-registering-vote-casting-ballots/.

2 | See U.S. Dept. of Just., Federal Prosecution of Election Offenses 66 (7th ed. 2007), available at https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbook-rvs0807.pdf.

3 | Va. Const., Art. II, Sec. 1.

4 |18 U.S.C. § 1015(f). It is also a felony for an individual to simply "falsely and willfully represent[] himself to be a citizen of the United States." 18 U.S.C § 911.

5 | The cancellation reports for all 120 counties are available at Exhibit 1 at the link provided on page 1 of this report. The cancellation reports cover two separate time periods and were received in two separate responses from state election officials. They have been combined into one exhibit for purposes of this report.

6 | This email is reproduced in its entirety at Exhibit 2.

7 | This estimate was based on the Census Bureau's 2016 Current Population Survey (CPS). The data can be queried using the CPS Table Creator available at https://www.census.gov/cps/data/cpstablecreator.html.

8 | http://leg1.state.va.us/cgi-bin/legp504.exe?151+ful+HB1315ER+pdf.

9 | http://leg1.state.va.us/cgi-bin/legp504.exe?151+amd+HB1315AG.

10 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+amd+SB1105AG.

11| https://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+SB1105.

12 | https://publicinterestlegal.org/blog/scores-of-counties-put-on-notice-about-corrupted-voter-rolls/.

13 | https://publicinterestlegal.org/blog/counties-on-notice/.

14 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+HB2343.

15 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+amd+HB2343AG.

16 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+HB1428.

17 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+SB872.

18 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+amd+HB1428AG.

19 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+amd+SB872AG.

20 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+SB1253.

21 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+amd+SB1253AG.

22 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+SB1455.

23 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+amd+SB1455AG.

24 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+SB1581.

25 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+amd+SB1581AG.

26 | 52 U.S.C. § 20501 et seq.

27 | See 52 U.S.C. § 20504(a)(1) and (c)(1).

28 | 52 U.S.C. § 20504(c)(2)(C).

29 | 52 U.S.C. § 20504(c)(2)(B)(ii).

30 | 52 U.S.C. § 20507(i).

31 | Complaint, Virginia Voter's Alliance, et al. v. Leider, No. 16-cv-394 (E.D. Va., April 7, 2016).

32 | An updated cancellation report subsequently received from the Department of Elections lists the "Declared Non-Citizen Total" as 443. See Exhibit 1.

33 | See Exhibit 3.

34 | An example of this notice is provided at Exhibit 4.

35 | The email is reproduced in its entirety at Exhibit 5.

36 | The email is reproduced in its entirety at Exhibit 6.

# Endnotes

37 | This cost was later waived after we informed Commissioner Cortes that the NVRA permits election officials to charge "reasonable costs" for "photocopying" only. 52 U.S.C. § 20507(i)(1). It does not permit election officials to impose costs for time spent producing records.

38 | See Exhibit 6.

39 | 18 U.S.C. § 2722(a).

40 | The court order is available at Exhibit 7.

41 | The email is reproduced in its entirety at Exhibit 8.

42 | Press Release, Haake retires April 1, VILLAGE NEWS (March 1, 2017), http://villagenewsonline.com/2017/03/01/haake-retires-april-1/.

43 | Va. Code Ann. § 24.2-406.

44 | http://leg1.state.va.us/cgi-bin/legp504.exe?151+ful+HB1315ER+pdf.

45 | The record of **REDACTED** 's cancellation is produced in its entirety at Exhibit 9.

46 | The email is reproduced in its entirety at Exhibit 10.

47 | Id.

48 | See Exhibit 2.

49 | An excerpt from the voting history records we received is available at Exhibit 11.

50 | http://historical.elections.virginia.gov/elections/search/year_from:2013/year_to:2013/office_id:12/stage:General.

51 | Vozzella and Pershing, Obenshain concedes Virginia attorney general's race to Herring, WASH. POST. (Dec. 18, 2013), https://www.washingtonpost.com/local/virginia-politics/obenshain-to-concede-virginia-attorney-generals-race-on-wednesday-in-richmond/2013/12/18/fe85a31c-67e7-11e3-8b5b-a77187b716a3_story.html?utm_term=.7eefdedfa511.

52 | http://historical.elections.virginia.gov/elections/search/year_from:2014/year_to:2014/office_id:9/district_id:27270/stage:General.

53 | http://historical.elections.virginia.gov/elections/search/year_from:2011/year_to:2011/office_id:8/district_id:27389/stage:General

54 | http://historical.elections.virginia.gov/elections/search/year_from:2011/year_to:2011/office_id:549/district_id:31510/stage:General.

55 | http://historical.elections.virginia.gov/elections/search/year_from:2011/year_to:2011/office_id:549/district_id:32289/stage:General.

56 | http://historical.elections.virginia.gov/elections/search/year_from:2011/year_to:2011/office_id:549/district_id:32310/stage:General.

57 | http://historical.elections.virginia.gov/elections/search/year_from:2011/year_to:2011/office_id:549/district_id:30310/stage:General.

58 | http://historical.elections.virginia.gov/elections/search/year_from:2011/year_to:2011/office_id:530/district_id:30255/stage:General.

59 | http://historical.elections.virginia.gov/elections/search/year_from:2011/year_to:2011/office_id:9/district_id:27280/stage:General.

60 | http://historical.elections.virginia.gov/elections/search/year_from:2012/year_to:2012/office_id:73/district_id:31552/stage:General.

61 | http://historical.elections.virginia.gov/elections/search/year_from:2013/year_to:2013/office_id:8/district_id:27388/stage:General.

62 | http://historical.elections.virginia.gov/elections/search/year_from:2013/year_to:2013/office_id:8/district_id:27389/stage:General.

63 | http://historical.elections.virginia.gov/elections/search/year_from:2013/year_to:2013/office_id:8/district_id:27305/stage:General.

64 | http://historical.elections.virginia.gov/elections/search/year_from:2013/year_to:2013/office_id:8/district_id:27334/stage:General.

65 | http://historical.elections.virginia.gov/elections/search/year_from:2013/year_to:2013/office_id:8/district_id:27337/stage:General.

66 | http://historical.elections.virginia.gov/elections/search/year_from:2015/year_to:2015/office_id:545/district_id:30256/stage:General.

# Endnotes

67 | http://historical.elections.virginia.gov/elections/search/year_from:2015/year_to:2015/office_id:8/district_id:27305/stage:General.

68 | http://historical.elections.virginia.gov/elections/search/year_from:2015/year_to:2015/office_id:8/district_id:27389/stage:General.

69 | The voter registration applications are produced at Exhibit 12.

70 | Documentation of    REDACTED    's registration is available at Exhibit 13.

71 | Graham Moomaw, Virginia House passes bill to require proof of citizenship to vote in state, local elections, ROANOKE TIMES (Feb. 1, 2017), http://www.roanoke.com/news/politics/general_assembly/virginia-house-passes-bill-to-require-proof-of-citizenship-to/article_8e4177a2-cc6c-5538-948a-f99d195815f4.html.

72 | http://historical.elections.virginia.gov/elections/search/year_from:2015/year_to:2015/office_id:8/district_id:27346/stage:General.

73 | http://virginiageneralassembly.gov/house/members/members.php.

74 | David McGee, Field set for June primaries, November House lineup, BRISTOL HERALD COURIER (April 1, 2017), http://www.heraldcourier.com/news/field-set-for-june-primaries-november-house-lineup/article_469d0622-7d6d-5337-8ece-36b7f108ffbd.html.

75 | Ken Plum, Del. Ken Plum: A Sense of Impending Changes in the Legislature, RESTON NOW (April 13, 2017), https://www.restonnow.com/2017/04/13/del-ken-plum-a-sense-of-impending-changes-in-the-legislature/.

76 | Jenna Portnoy, Kaine has big lead in 2018 Senate race, early polling shows, WASH. POST. (Feb. 17, 2017), https://www.washingtonpost.com/local/virginia-politics/kaine-has-big-lead-in-2018-senate-race-early-polling-shows/2017/02/17/0ab08564-f537-11e6-a9b0-ecee7ce475fc_story.html?utm_term=.f21368b35e32.



"Growth Through Immigration and Diversity Builds a Strong Community"
Banner hanging outside elections office at County of Arlington

# PUBLIC INTEREST
## LEGAL FOUNDATION



For all media inquiries, please
contact us at (317) 203-5599 or
media@publicinterestlegal.org

www.publicinterestlegal.org

PUBLIC INTEREST
——— LEGAL FOUNDATION ———
32 E. Washington St.
Suite 1675
Indianapolis, IN 46204
(317) 203-5599

**Exhibit C**

**COMMONWEALTH OF VIRGINIA**

**DEPARTMENT OF ELECTIONS**

**Cancellation - Declared Non-Citizen**

**153 - PRINCE WILLIAM COUNTY**

Locality: 153
Precinct: ALL
District: ALL

Start Date: 01/01/2011
End Date: 08/16/2016

### August 2015

| PCT | Name<br>Address | Registration ID | Cancel<br>Date | Cancel Type |
|-----|-----------------|-----------------|----------------|-------------|
| 0201 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0303 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0402 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0409 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0504 | FREEMAN, LUCIANIA C.<br>REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0512 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0601 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0608 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |

### September 2015

| PCT | Name<br>Address | Registration ID | Cancel<br>Date | Cancel Type |
|-----|-----------------|-----------------|----------------|-------------|
| 0110 | REDACTED | REDACTED | 9/22/2015 | Declared Non-Citizen |
| 0111 | REDACTED | REDACTED | 9/22/2015 | Declared Non-Citizen |
| 0207 | REDACTED | REDACTED | 9/21/2015 | Declared Non-Citizen |
| 0703 | REDACTED | REDACTED | 9/22/2015 | Declared Non-Citizen |

### October 2015

| PCT | Name<br>Address | Registration ID | Cancel<br>Date | Cancel Type |
|-----|-----------------|-----------------|----------------|-------------|
| 0201 | REDACTED | REDACTED | 10/29/2015 | Declared Non-Citizen |
| 0302 | REDACTED | REDACTED | 10/14/2015 | Declared Non-Citizen |

| 1 | *Are you a citizen of the United States of America? ☑YES ☐NO | *Will you be at least 18 years of age on or before the next General Election day? ☑YES ☐NO | If you checked "NO" in response to either of these questions, do not complete this form. |
|---|---|---|---|

| 2 | | ☐Male ☑Female | REDACTED | REDACTED |
|---|---|---|---|---|
| | | *Gender  *Date of Birth | | Daytime Telephone Number |

| Freeman | Lucianla | Clurice | ☐None | ☑Nor |
|---|---|---|---|---|
| *Last Name | *First Name | *Full Middle or Maiden Name | *Suffix (Jr., Sr., III, Etc |

| 3 | REDACTED |
|---|---|
| | *Residence (Permanent) Home Address    Apt/Unit/Lot/Rm/Ste  City/Town    Zip Code |
| | REDACTED |
| | If Rural Address or Homeless, please describe where you reside    E-mail address |
| | REDACTED |
| | Mailing Address (If different)/ Virginia P.O.Box or Uniformed Service Address, if applicable (include Zip Code)    ☐City or ☑County    Name of City or County of Residence |

| 4 | *Have you ever been convicted of a felony? ☐YES ☑NO    State where convicted |
|---|---|
| | If YES, have your voting rights been restored? ☐YES ☐NO    If YES, when restored? ☐☐,☐☐,☐☐☐☐ |

| 5 | *Have you ever been judged mentally incapacitated? ☐YES ☑NO |
|---|---|
| | If YES, has court restored you to capacity? ☐YES ☐NO    If YES, when restored? ☐☐,☐☐,☐☐☐☐ |

| 6 | Registration Statement: I swear/affirm, under felony penalty for making willfully false material statements or entries, that the information provided on this form is true. I authorize the cancellation (entered in Box 7 below) of my current registration and I have rea the Privacy Act Notice on the front of this form. |
|---|---|
| → | *Signature (or mark if unable to sign) ___Uclante Semon___   09,19,200 |
| | SEP 26 2008 |
| | If applicant is unable to sign due to a physical disability, write the name/address of person who assisted. (Required) ☐Check/describe if you have a disability that requires accommodation in order to |
| | ☐I'm interested in being an Election Official on Election Day. Please send me information. | You may request that your home address not be released if you (a) are active or retired law enforcement, or (b) have been granted a protective court order, or (c) are in of your personal safety from someone who has threatened or stalked you and have filed a complaint against that person with a magistrate or law enforcement (must a copy of complaint). You must show a Virginia P.O. box under mailing address in Box 3 above.  ☐Law Enforcement  ☐Protective Order  ☐Threatened/Stalke |

CANCELLED DECLARED NON CITIZEN AUG 2 2015

**<u>Exhibit D</u>**

# COMMONWEALTH OF VIRGINIA
## DEPARTMENT OF ELECTIONS
## Cancellation - Declared Non-Citizen
### 059 - FAIRFAX COUNTY

**Start Date: 01/01/2011**
**End Date: 03/20/2017**

**Locality: ALL**
**Precinct: ALL**
**District: ALL**

| 0919 | REDACTED | REDACTED | 3/27/2012 | Declared Non-Citizen |
| 0923 | REDACTED | REDACTED | 3/27/2012 | Declared Non-Citizen |

**April 2012**

| PCT | Name Address | Registration ID | Cancel Date | Cancel Type |
|-----|------|------|------|------|
| 0105 | REDACTED | REDACTED | 4/23/2012 | Declared Non-Citizen |
| 0237 | REDACTED | REDACTED | 4/30/2012 | Declared Non-Citizen |

**May 2012**

| PCT | Name Address | Registration ID | Cancel Date | Cancel Type |
|-----|------|------|------|------|
| 0106 | REDACTED | REDACTED | 5/8/2012 | Declared Non-Citizen |
| 0110 | REDACTED | REDACTED | 5/8/2012 | Declared Non-Citizen |
| 0115 | REDACTED | REDACTED | 5/3/2012 | Declared Non-Citizen |
| 0121 | REDACTED | REDACTED | 5/3/2012 | Declared Non-Citizen |
| 0123 | REDACTED | REDACTED | 5/3/2012 | Declared Non-Citizen |
| 0131 | REDACTED | REDACTED | 5/3/2012 | Declared Non-Citizen |
| 0209 | REDACTED | REDACTED | 5/8/2012 | Declared Non-Citizen |
| 0220 | REDACTED | REDACTED | 5/8/2012 | Declared Non-Citizen |
| 0226 | REDACTED | REDACTED | 5/3/2012 | Declared Non-Citizen |
| 0315 | REDACTED | REDACTED | 5/3/2012 | Declared Non-Citizen |
| 0321 | BONILLA, ELIUD REDACTED | REDACTED | 5/3/2012 | Declared Non-Citizen |

# COMMONWEALTH OF VIRGINIA
# DEPARTMENT OF ELECTIONS
## Cancellation - Declared Non-Citizen
## 153 - PRINCE WILLIAM COUNTY

**Locality: ALL**
**Precinct: ALL**
**District: ALL**

**Start Date: 01/01/2011**
**End Date: 03/20/2017**

### August 2015

| PCT | Name Address | Registration ID | Cancel Date | Cancel Type |
|-----|--------------|-----------------|-------------|-------------|
| 0201 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0303 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0402 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0409 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0504 | FREEMAN, LUCIANIA C. REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0512 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0601 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0608 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |

### September 2015

| PCT | Name Address | Registration ID | Cancel Date | Cancel Type |
|-----|--------------|-----------------|-------------|-------------|
| 0110 | REDACTED | REDACTED | 9/22/2015 | Declared Non-Citizen |
| 0111 | REDACTED | REDACTED | 9/22/2015 | Declared Non-Citizen |
| 0207 | REDACTED | REDACTED | 9/21/2015 | Declared Non-Citizen |
| 0703 | REDACTED | REDACTED | 9/22/2015 | Declared Non-Citizen |

### October 2015

| PCT | Name Address | Registration ID | Cancel Date | Cancel Type |
|-----|--------------|-----------------|-------------|-------------|
| 0201 | REDACTED | REDACTED | 10/29/2015 | Declared Non-Citizen |
| 0302 | REDACTED | REDACTED | 10/14/2015 | Declared Non-Citizen |

**1** * Are you a citizen of the United States of America?   ☒ YES   ☐ NO

* Will you be at least 18 years of age on or before the next General Election day?   ☒ YES ☐ NO

If you checked "NO" in response to either of these questions, do not complete this form.

REDACTED

☐ Male   ☒ Female

Social Security Number     * Gender          * Date of Birth          Daytime Telephone Number

ROSEN , JEANNE , ANN E                                    Sanzone         ☐ None                    ☐ None
* Last Name                    * First Name            * Full Middle or Maiden Name        * Suffix (Jr.,Sr.,III,Etc.)

**3**                    REDACTED

* Residence (Permanent) Home Address                Apt/Unit/Lot/Rm/Ste   City/Town              Zip Code

If Rural Address or Homeless, please describe where you reside                E-mail address

Mailing Address (if different) /Virginia P.O. Box or Uniformed Service Address, if   ☐ City or   ☐ County
applicable (include Zip Code)              Name of City or County of Residence   REDACTED

**4** * Have you ever been convicted of a felony?   ☐ YES   ☒ NO   State where convicted
If YES, have your voting rights been restored?   ☐ YES   ☐ NO   If YES, when restored?  M M  D D  Y Y Y Y

**5** * Have you ever been judged mentally incapacitated?   ☐ YES   ☒ NO
If YES, has court restored you to capacity?   ☐ YES   ☐ NO   If YES, when restored?  M M  D D  Y Y Y Y

**6** Registration Statement: I swear/affirm, under felony penalty for making willfully false material statements or entries, that the information provided on this form is true.  I authorize the cancellation (entered in Box 7 below) of my current registration and I have read the Privacy Act Notice above.

* Signature (or mark if unable to sign)   Jeanne Rosen           REDACTED

09-18-2013   0402
If applicant is unable to sign due to a physical disability, write the name/address of person who assisted. (Required).   ☐ Check if you have a disability that requires someone to assist you in order to vote.

☐☐☐  Protected Voter Code if applicable.  See above.               RECEIVED SEP 1 8 2013
☐ I'm interested in being an Election Official on Election Day.  Please send me information.

**1** | * Are you a citizen of the United States of America? ☑ YES ☐ NO | * Will you be at least 18 years of age on or before the next General Election day? ☑ YES ☐ NO | If you checked "NO" in response to either of these questions, do not complete this form.

REDACTED

Male ☐ ☑ Female

* Social Security Number | * Gender | * Date of Birth | Daytime Telephone Number

FOCHT ~ABBY~LEE | Abby | Sharpe | ☐ None | ☐ None
* Last Name | * First Name | * Full Middle or Maiden Name | * Suffix (Jr.,Sr.,III,Etc.)

**3** | REDACTED

* Residence (Permanent) Home Address | Apt/Unit/Lot/Rm/Ste | City/Town | Zip Code

If Rural Address or Homeless, please describe where you reside | E-mail address

Mailing Address (if different) /Virginia P.O. Box or Uniformed Service Address, if applicable (include Zip Code) | ☐ City or ☐ County
Name of City or County of Residence | REDACTED

**4** | * Have you ever been convicted of a felony? ☐ YES ☑ NO | State where convicted
If YES, have your voting rights been restored? ☐ YES ☐ NO | If YES, when restored? M M D D Y Y Y Y

**5** | * Have you ever been judged mentally incapacitated? ☐ YES ☑ NO
If YES, has court restored you to capacity? ☐ YES ☐ NO | If YES, when restored? M M D D Y Y Y Y

**6** | Registration Statement: I swear/affirm, under felony penalty for making willfully false material statements or entries, that the information provided on this form is true. I authorize the cancellation (entered in Box 7 below) of my current registration and I have read the Privacy Act Notice above.

➡ * Signature (or mark if unable to sign) | 03 24 2012
04512 013

If applicant is unable to sign due to a physical disability, write the name/address of person who assisted. (Required) | ☐ Check/describe if you have a disability that requires accommodation in order to vote.

☐ I'm interested in being an Election Official on Election Day. Please send me information. | You may request that your home address not be released if you or a member of your household are a) active or retired law enforcement, or b) have been granted a protective court order, or c) are in fear of your personal safety from someone who has threatened or stalked you and have filed a complaint against that person with a magistrate or law enforcement (must attach copy of complaint) or d) participate in the Address Confidentiality Program. You must show a Virginia P.O. box under mailing address in Box 3 above.
☐ Law Enforcement ☐ Protective Order ☐ Threatened/Stalked ☐ Address Confidentiality Program

| OFFICE USE ONLY | OFFICE USE ONLY | | OFFICE USE ONLY |
|---|---|---|---|
| NEW LAST NAME | NEW FIRST, MIDDLE/MAIDEN NAME AND SUFFIX | | DATE CHANGED |
| OTHER CHANGES | NEW PCT | AUTHORIZED BY | DATE CHANGED |

| | | |
|---|---|---|
| ☐ DECEASED _____ | ☐ JUDGED INCAPACITATED _____ | ☐ TRANSFERRED OUT _____ |
| ☐ OUT OF STATE _____ | ☐ ERROR DELETED _____ | ☑ RE-REGISTERED 6-13-14 |
| ☐ PERSONAL REQUEST _____ | ☐ NVRA PURGE _____ | ☐ INACTIVE STATUS w/name chg Scarhere |
| ☐ CONVICTED OF A FELONY _____ | | ☐ REACTIVATED _____ |
| NOTES: | | Removed 6-25-14 |

**1** | **\*Are you a citizen of the United States of America?** ☒YES ☐NO | **\*Will you be at least 18 years of age on or before the next General Election day?** ☒YES ☐NO | **If you checked "NO" in response to either of these questions, do not complete this form.**

**2** | ☒Male ☐Female | | **REDACTED**
**\*Social Security Number** | **\*Gender** | **\*Date of Birth** | **Daytime Telephone Number**

Bonilla | Eliud | | ☒None | ☒None
**\*Last Name** | **\*First Name** | | **\*Full Middle or Maiden Name** | **\*Suffix (Jr., Sr., III, Etc.)**

**3** | | **REDACTED**
**\*Residence (Permanent) Home Address** | | Apt/Unit/Lot/Rm/Ste  City/Town | | Zip Code

If Rural Address or Homeless, please describe where you reside | | E-mail address
| | **REDACTED**

Mailing Address (If different)/ Virginia P.O.Box or Uniformed Service Address, if applicable (include Zip Code) | ☐City  or  ☒County
| **Name of City or County of Residence**

**4** | **\*Have you ever been convicted of a felony?** ☐YES ☒NO   State where convicted
If YES, have your voting rights been restored? ☐YES  ☐NO  If YES, when restored? ☐☐ / ☐☐ / ☐☐☐☐

**5** | **\*Have you ever been judged mentally incapacitated?** ☐YES ☒NO
If YES, has court restored you to capacity? ☐YES ☐NO    If YES, when restored? ☐☐ / ☐☐ / ☐☐☐☐

**6** | **Registration Statement:** I swear/affirm, under felony penalty for making willfully false material statements or entries, that the information provided on this form is true. I authorize the cancellation (entered in Box 7 below) of my current registration and I have read the Privacy Act Notice on the front of this form.

→ **\*Signature (or mark if unable to sign)** _Eliud Bonilla_  | 0|8| / |3|1| / |2|0|1|2|
0 9 2 4 1 2    _Cancelled declared Non-Citizen  5-3-2012_

If applicant is unable to sign due to a physical disability, write the name/address of person who assisted. (Required). ☐Check/describe if you have a disability that requires accommodation in order to vote.

☐ I'm interested in being an Election Official on Election Day. Please send me information. | You may request that your home address not be released if you or member of your household (a) are active or retired law enforcement, or (b) have been granted a protective court order, (c) are in fear of your personal safety from someone who has threatened or stalked you and have filed a complaint against that person with a magistrate or law enforcement (must attach copy of complaint), or (d) participate in the Address Confidentiality Program. You must show a Virginia P.O. box under mailing address in Box 3 above. ☐Law Enforcement ☐Protective Order ☐Threatened/Stalked ☐Address Confidentiality Program

PILF00050

| 1 | *Are you a citizen of the United States of America? ☑YES ☐NO | *Will you be at least 18 years of age on or before the next General Election day? ☑YES ☐NO | If you checked "NO" in response to either of these questions, do not complete this form. |
|---|---|---|---|

| 2 | | ☐Male ☑Female | **REDACTED** | **REDACTED** |
|---|---|---|---|---|
| | | *Gender | *Date of Birth | Daytime Telephone Number |

| Freeman | Luciania | Clurice | ☐None | ☑Nor |
|---|---|---|---|---|
| *Last Name | *First Name | *Full Middle or Maiden Name | *Suffix (Jr., Sr., III, Etc |

| 3 | **REDACTED** | | | |
|---|---|---|---|---|
| | *Residence (Permanent) Home Address | Apt/Unit/Lot/Rm/Ste | City/Town | Zip Code |
| | | | | **REDACTED** |
| | If Rural Address or Homeless, please describe where you reside | | E-mail address | |
| | | | | **REDACTED** |
| | Mailing Address (If different)/ Virginia P.O. Box or Uniformed Service Address, if applicable (include Zip Code) | | ☐City or ☑County | Name of City or County of Residence |

| 4 | *Have you ever been convicted of a felony? ☐YES ☑NO | State where convicted |
|---|---|---|
| | If YES, have your voting rights been restored? ☐YES ☐NO | If YES, when restored? M M D D , Y Y Y Y |

| 5 | *Have you ever been judged mentally incapacitated? ☐YES ☑NO | |
|---|---|---|
| | If YES, has court restored you to capacity? ☐YES ☐NO | If YES, when restored? M M D D , Y Y Y Y |

| 6 | Registration Statement: I swear/affirm, under felony penalty for making willfully false material statements or entries, that the information provided on this form is true. I authorize the cancellation (entered in Box 7 below) of my current registration and I have re... the Privacy Act Notice on the front of this form. |
|---|---|

→ *Signature (or mark if unable to sign) _[signature]_ Lucian... Fremen   09 , 19 , 200

SEP 26 2008

If applicant is unable to sign due to a physical disability, write the name/address of person who assisted. (Required). ☐Check/describe if you have a disability that requires accommodation in order to v...

| ☐I'm interested in being an Election Official on Election Day. Please send me information. | You may request that your home address not be released if you (a) are active or retired law enforcement, or (b) have been granted a protective court order, or (c) are in fear of your personal safety from someone who has threatened or stalked you and have filed a complaint against that person with a magistrate or law enforcement (must at... copy of complaint). You must show a Virginia P.O. box under mailing address in Box 3 above. ☐Law Enforcement ☐Protective Order ☐Threatened/Stalke |
|---|---|

CANCELLED   DECLARED NON CITIZEN   AUG 1 2 2015