**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――

**No. 19-2265**

―――――――

PUBLIC INTEREST LEGAL FOUNDATION, INC.,

                    Plaintiff - Appellant,

        v.

NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON
BELL, in her official capacity as Executive Director of the North Carolina State
Board of Elections,

                    Defendants – Appellees.

-------------------------------

ASSOCIATION OF MEXICANS IN NORTH CAROLINA; EL PUEBLO, INC.;
NORTH CAROLINA ASIAN AMERICANS

                    Amici Supporting Appellee.

―――――――

Appeal from the United States District Court for the Eastern District of North Carolina, at
Raleigh.  Terrence W. Boyle, District Judge.  (5:19−cv−00248−BO)

―――――――

Argued:  December 10, 2020                    Decided:  May 10, 2021

―――――――

Before GREGORY, Chief Judge, AGEE, and KEENAN, Circuit Judges.

―――――――

Vacated and remanded with instructions by published opinion.  Judge Keenan wrote the
opinion, in which Chief Judge Gregory and Judge Agee joined.

―――――――

**ARGUED:** William Earl Davis, FOLEY & LARDNER LLP, Jacksonville, Florida, for Appellant. Ryan Y. Park, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Noel H. Johnson, Kaylan L. Phillips, PUBLIC INTEREST LEGAL FOUNDATION, Indianapolis, Indiana, for Appellant. Joshua H. Stein, Attorney General, Caryn Devins Strickland, Solicitor General Fellow, Paul M. Cox, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. Allison Riggs, Jeffrey Loperfido, SOUTHERN COALITION FOR SOCIAL JUSTICE, Durham, North Carolina; Donald Salzman, Geoffrey Wyatt, Kathleen Shelton, Desislava Kireva, Washington, D.C., for Amici Association of Mexicans in North Carolina, Inc., El Pueblo, Inc., and North Carolina Asian Americans.

———————————

2

BARBARA MILANO KEENAN, Circuit Judge:

In this appeal, we consider whether the district court erred by dismissing under Federal Rule of Civil Procedure 12(b)(6) the plaintiff's claim against the executive director of the North Carolina State Board of Elections (the Board, or the state Board) alleging a violation of the disclosure provision in the National Voter Registration Act of 1993 (the NVRA), 52 U.S.C. § 20507(i)(1). The plaintiff, the Public Interest Legal Foundation, Inc. (the Foundation), sought disclosure of broad categories of documents related to the identification of North Carolina voter registrants whom the Board had identified as potentially failing to satisfy the statutory citizenship requirement. *See* N.C. Gen. Stat. §§ 163-54, 55(a) (together explaining that United States citizenship is a requirement for registration and voting in North Carolina). The district court dismissed the complaint, concluding that the Foundation failed to state a claim under the NVRA based on the sensitive nature of the information sought and the potential for abuse.

Upon our review, we hold that the district court erred in dismissing the complaint at this stage of the proceedings. Because discovery was not conducted, we cannot discern on this record whether the Foundation may be entitled to disclosure of some of the documents requested. We therefore remand the case to the district court for further consideration of the documents subject to four restrictions excluding from disclosure: (1) information precluded from disclosure by the Privacy Act of 1974, 5 U.S.C. § 552a(b) (the Privacy Act), and the Driver's Privacy Protection Act of 1994, 18 U.S.C. § 2721(c) (the Driver Protection Act); (2) information obtained from confidential federal databases under the United States Department of Homeland Security's Systemic Alien Verification for

3

Entitlements system (the SAVE system) that is otherwise protected from disclosure by statute or by the Board's agreement with the Department regarding confidentiality; (3) any requested voter registration applications, or the names affiliated with those applications, that are subject to protection as part of any prior or current criminal investigation; and (4) the identities and personal information of individuals who potentially committed criminal offenses, including those who later were determined to be United States citizens, which must be redacted from any documents ultimately released as sensitive information vulnerable to abuse.  We therefore vacate the district court's judgment and remand for further proceedings.

## I.

The Foundation is a "public interest organization" that "seeks to promote the integrity of elections nationwide," using public records laws to gather information about voters and producing "reports, articles, [and] blog and social media posts" to advance its mission.  The Foundation has requested information from boards of elections in other jurisdictions and has publicized information from those sources in the national media.

In 2018, the Foundation requested documents under the NVRA's disclosure provision, 52 U.S.C. § 20507(i)(1) (the disclosure provision), from five county boards of elections in North Carolina (the county boards).  That provision requires states to "make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."  52 U.S.C. § 20507(i)(1).

4

In its requests to the county boards, the Foundation listed wide-ranging categories of documents concerning "the actions county election officials have taken to identify and cancel registrations belonging to individuals who do not satisfy the citizenship requirements for voting."  The Foundation requested:

> [] Documents regarding *all registrants who were identified* as *potentially not satisfying the citizenship requirements* for registration from any official information source, including *information obtained from the various agencies* within the U.S. Department of Homeland Security, North Carolina Department of Motor Vehicles, and from the [state Board] since January 1, 2006[, and] all documents that provide the name of the registrant, the voting history of such registrant, the nature and content of any notice sent to the registrant, including the date of the notice, the response (if any) of the registrant, and actions taken regarding the registrant's registration (if any) and the date of the action . . . .

> [] All documents and records of communication received by your office from registered voters, legal counsel, claimed relatives, or other agents since January 1, 2006 requesting a removal or cancellation from the voter roll for any reason related to non-U.S. citizenship . . . .[1] (emphasis added).

The Foundation further specified that it requested "completed voter application" forms, with necessary redactions for social security numbers and signatures, for individuals "identified as potentially not satisfying the citizenship requirements."  Notably, the forms

---

[1] The request also included "[a]ll documents and records of communication received by your office from jury selection officials," that discuss "individuals who claimed to be non-U.S. citizens when attempting to avoid serving a duty call."  However, the state Board does not have access to documents related to jury service.  *See* Governor Roy Cooper Objections and Veto Message, S. Bill 250 (Nov. 6, 2019), https://webservices.ncleg.gov/ViewBillDocument/2019/6866/0/S250-BD-NBC-8368 (last visited Mar. 11, 2021) (discussing the veto of a bill passed by the North Carolina General Assembly that would have allowed access to jury responses, because such a law would create "a high risk of voter harassment and intimidation and could discourage citizens from voting").

5

ask registrants to "check boxes" to affirm that they satisfy voter eligibility requirements, including that the registrants are United States citizens.

The state Board ultimately contacted the Foundation about its requests made to the county boards. The Foundation maintained that the Board was "in violation of the NVRA for failure to permit inspection and photocopying of public records as required by 52 U.S.C. § 20507(i)." According to the Foundation, it could enforce compliance with its request by filing suit under the NVRA in federal court. *See id.* § 20510(b) (providing a private right of action if a violation of the NVRA is "not corrected within 90 days after receipt of a notice" or, if the violation "occurred within 30 days before" a federal election, no notice is required before filing a civil action for enforcement).

After receiving this notification, counsel for the state Board responded to the Foundation by letter and provided several documents. The Board directed the Foundation to records publicly available on the Internet regarding "list maintenance activities as to each registered voter," which records are updated weekly and list the individuals removed from the voter roll, the reason for that removal, and the date of removal. Also, the Board informed the Foundation that it could find online voter participation history for all voters in North Carolina.

The Board provided to the Foundation a "Post-Election Audit Report," issued in April 2017, regarding the 2016 general election (the 2016 Audit). The 2016 Audit explained the Board's three-step process of confirming the citizenship of voter registration applicants. First, the Board compares its information with data from the North Carolina Division of Motor Vehicles (the DMV) regarding driver's licenses that were issued with a

6

restriction code indicating that an individual is not a citizen. Second, the Board obtains information from the SAVE system federal database. The SAVE system allows the Board to access confidential databases maintained by the United States Citizenship and Immigration Service (USCIS), located within the Department of Homeland Security, to view immigration-related records.

After consulting these sources of information, the Board found that the DMV and SAVE information had a high rate of inaccuracy. The Board determined that 97.6% of persons identified by the DMV as noncitizens, in fact were citizens, and that about 75% of individuals who later provided proof of citizenship continued to be listed as noncitizens in the SAVE system. Thus, in the third step of its investigation into registrants' citizenship status, the Board communicates with individual registrants to request certification of their citizenship by evidence of an "official document," such as a birth certificate, passport, or certificate of naturalization. In this communication, the Board informs the recipient that it is a crime under North Carolina law for a noncitizen to vote in a state or federal election. *See* N.C. Gen. Stat. § 163-275(1) (establishing that this crime is a *felony* offense); *see also* 18 U.S.C. § 611 (prohibiting aliens from voting in federal elections).

Referencing this verification process, the 2016 Audit showed that 41 noncitizens with legal status to reside in the United States cast ballots, and that 34 voters "provided documents showing [that] they *are* U.S. citizens." At the time the 2016 Audit was released, investigators were "continu[ing] to review 61 additional records" of registrants regarding citizenship eligibility. Notably, about 4.8 million voters cast ballots in the 2016 general election in North Carolina.

7

In addition to disclosing the 2016 Audit, the Board also provided the Foundation with a 2013 Memorandum of Agreement (MOA) between the Board and USCIS. The MOA with USCIS (1) restricts the Board's ability to use information from the SAVE system to determining voter eligibility, (2) requires written consent from the agencies before disclosing such information, and (3) requires compliance with the Privacy Act to protect requested data. Finally, the Board disclosed to the Foundation memoranda issued by the Board in 2018 and 2019, which had been sent to local boards of elections providing updated information about grand jury subpoenas served on the Board by the United States Attorney's Office. According to those memoranda, the Board and the local boards would be providing the United States Attorney registration records of 789 individuals statewide.[2] Before these memoranda were issued, federal prosecutors had charged 19 individuals in 2018 with registering to vote and voting illegally in North Carolina in the 2016 presidential election.

Although the Board disclosed the above documents describing its process of investigating potential noncitizen registrants, the Board informed the Foundation that it was "unable to disclose the identity of particular individuals in the manner" the Foundation had requested. The Board explained that under the MOA, the Board is required to "protect" the confidentiality of information provided by USCIS "for the purpose of determining the eligibility" of voter registrants. The Board further related that it was prohibited from

---

[2] The memoranda indicated that the subpoenas likely covered documents held by the county boards to which the Foundation made its records request, namely Durham, Forsyth, Guilford, Mecklenburg, and Buncombe counties.

8

disclosing "alien identification numbers" obtained from the DMV, which are protected from disclosure under the Driver Protection Act.

The Board also stated that disclosure of some of the requested documents would violate its duty to protect "the identity of any prior or current registrant that may be subject to review by federal law enforcement," and that the Board and the county boards were "continu[ing] to provide records sought by federal law enforcement." Under North Carolina General Statute § 163-22(d), the Board is charged with investigating election "frauds and irregularities" and must "report violations of the election laws to the Attorney General or district attorney or prosecutor of the district for further investigation and prosecution."

Unsatisfied with the Board's response, the Foundation filed suit in federal district court against Karen Brinson Bell, in her official capacity as the Executive Director of the state Board.[3] In its complaint, the Foundation alleged that the Board had violated the NVRA's disclosure provision. The Foundation sought a declaratory judgment and an order requiring the Board to comply with the Foundation's broad records request.

In response, the Board filed a motion to dismiss under Rule 12(b)(6) arguing that the requested records were "exempt from disclosure" for the reasons explained above. Additionally, the Board filed an ex parte motion to stay the case, which motion the Board

---

[3] The Foundation also named the state Board as a defendant, but the district court dismissed it as immune from suit under the Eleventh Amendment. The Foundation does not challenge this ruling on appeal.

9

sought to seal.[4]   The Board asserted that its "motion and memorandum of law discuss matters that are before [the district court] in sealed proceedings relating to sealed criminal investigations and grand jury subpoenas issued pursuant to these investigations."

████████████████████████████████████████  the district court granted the Board's motion to dismiss the Foundation's claim.   The court concluded that "nothing in the NVRA requires" the release of "uniquely sensitive" information that is "vulnerable to abuse," such as the identity of individuals subject to immigration violations or criminal charges, and documents like passports and birth certificates.   Without inspecting any of the documents at issue, the court held that the Foundation's request was not limited to voter registration records but included requests for documents protected by the Privacy Act and the Driver Protection Act.   The Foundation appeals from the district court's order of dismissal.

## II.

We review de novo the district court's dismissal of the complaint under Rule 12(b)(6), accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor.  *Mason v. Mach. Zone, Inc.*, 851 F.3d 315, 319 (4th Cir. 2017).   To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on

---

[4] We reject the Foundation's assertion on appeal that the district court abused its discretion by permitting the Board to submit these sealed and *ex parte* filings.  This Court has reviewed certain sealed documents filed in the district court and affirms that court's handling of these sensitive materials.  By separate order, we also grant the Board's motion to seal these materials, which were filed in this Court in a supplemental appendix.

10

its face" to show "that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

The Foundation argues that the district court erred in dismissing its claim by failing to enforce the plain language of the NVRA's disclosure provision. Focusing on the phrase "*all* records" in the statute, the Foundation asserts that any documents "concerning [the Board's] noncitizen audit processes" must be made publicly available because those documents necessarily concern the process by which the Board keeps its official voter lists current and accurate.[5] The Foundation further submits that the requested information does not fall within the two exemptions from disclosure listed in the statute. According to the Foundation, the district court "judicially amended" the statute to create an additional

---

[5] In its brief, the Foundation suggests that the Board failed to produce any records pertaining to audits from 2013 and 2014, "even those that merely describe the methodology and results of the audit, without identifying any particular registrant." Because the suit is premised on an underlying failure to provide requested documents, these audit reports could form the basis for alleging a violation of the NVRA only if it is shown that they would have been responsive to one of the Foundation's requests. Nothing in the record shows that the Foundation specifically requested from the Board audit reports for years prior to 2016.

The Foundation's requests, however, are broad enough that the audits *may* have contained some of the requested information. For example, the Foundation's letter to the county boards sought "[d]ocuments regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration" and "all documents that provide the name of the registrant, the voting history of such registrant, the nature and content of any notice sent to the registrant, . . . the response (if any) of the registrant, and actions taken regarding the registrant's registration (if any) and the date of the action." The complaint incorporates this request in its allegations that the Board violated the NVRA.

On remand, should the Foundation specifically press for disclosure of the 2013, 2014, or other audits in the district court, we leave it to that court to determine in the first instance whether the audits contain requested information and to what extent the privacy concerns at issue with the rest of the materials also apply to the contents of those audits.

11

exemption, contrary to Congressional intent and inconsistent with this Court's holding in *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012).

In response, the Board acknowledges that the NVRA was designed as a government-transparency statute, but submits that the Board is bound by numerous obligations beyond the NVRA that require maintaining the privacy of certain information. The Board points to its obligations to ongoing federal criminal investigations, the Privacy Act, the Driver Protection Act, and documents obtained through the SAVE system that are otherwise protected from disclosure. Thus, the Board asserts that the district court correctly dismissed the Foundation's complaint under Rule 12(b)(6).

A.

Although the Foundation is correct that the NVRA's disclosure provision is broad and does not contain an explicit exemption from disclosure for sensitive information subject to potential abuse, we nonetheless agree in large part with the Board's position. Contrary to the Foundation's argument, the term "all records" in the disclosure provision does not encompass any relevant record from any source whatsoever, but must be read in conjunction with the various statutes enacted by Congress to protect the privacy of individuals and confidential information held by certain governmental agencies. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988) (explaining that when interpreting statutory provisions, courts "presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts"). Likewise, the concerns of confidentiality regarding criminal investigations also must be considered in examining the disclosure provision. *See* Fed. R. Crim P. 6(e)(2)(B)(vii); *cf. Va. Dep't of State Police v.*

12

*Wash. Post*, 386 F.3d 567, 579 (4th Cir. 2004) (recognizing that "a compelling governmental interest exists in protecting the integrity of an ongoing law enforcement investigation"); *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 78 (1st Cir. 2004) (discussing district court's discretionary authority to stay civil proceedings in deference to parallel criminal proceedings); *Baumann v. District of Columbia*, 795 F.3d 209, 216 (D.C. Cir. 2015) (explaining government's "weighty interest in preserving confidential information that, if released publicly, could jeopardize the successful conclusion of a criminal investigation"); *United States v. Doe*, 962 F.3d 139, 152-53 (4th Cir. 2020) (after considering facts surrounding request, holding that district court should seal its order referencing defendant's cooperation with government's investigation in other cases based on potential harm to defendant).

With these concerns in mind, we turn to consider the history of the NVRA and its relevant provisions. In enacting the NVRA, Congress explained that the right to vote is a "fundamental right" and that governments must "promote the exercise of that right." National Voter Registration Act of 1993, Pub. L. No. 103-31, § 2, 107 Stat. 77 (codified at 52 U.S.C. § 20501(a)(1)-(2)). Prior to the NVRA's enactment, many states had been removing registered voters from the rolls "merely because they [had] failed to cast a ballot in a recent election." S. Rep. No. 103-6, at 17 (1993). Congress found that these "purge systems" had been used to "violate the basic rights of citizens," particularly members of "minority communities." *Id.* at 18. Accordingly, the stated "purposes" of the NVRA are (1) "to establish procedures" that "increase the number of eligible citizens who register to vote in elections for Federal office;" (2) to permit federal, state, and local governments to

13

"enhance[] the participation of eligible citizens as voters in elections for Federal office;" (3) "to protect the integrity of the electoral process;" and (4) "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b). Regarding purposes (3) and (4), any "program or activity" conducted by the state to achieve these particular goals must "be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." *Id.* § 20507(b).

Under the NVRA, states must permit voters to register by at least three methods: (1) by applying to vote while filing an application for a driver's license; (2) by submitting an application through the United States Postal Service; or (3) by submitting an application in person at a designated location, including offices providing public assistance and services to persons with disabilities. *Id.* §§ 20503(a)(1)-(3), 20506(a)(2). And, to remove a registrant from the official list of eligible voters, states must establish a "general program" of removal for those who have died or have changed their residence. *Id*. § 20507(a)(4). States also may remove a registrant from eligible voter lists when the registrant requests removal or when state law mandates removal. *Id*. § 20507(a)(3). Indeed, North Carolina law requires the Board to "adopt a uniform program that makes a diligent effort not less than twice each year . . . [t]o remove the names of ineligible voters from the official lists of eligible voters." N.C. Gen. Stat. § 163-82.14(a).

The NVRA's disclosure provision requires that states "maintain for at least 2 years" and allow "public inspection" of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). The disclosure provision expressly

14

exempts two categories of records, namely, records related to an individual's decision declining to register, and records identifying the agency where a voter registered. *Id.*; *see also id.* § 20507(a)(6).

## B.

We next discuss in some detail our decision in *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331, 333-35 (4th Cir. 2012), in which we considered the NVRA's disclosure provision and held that completed voter registration applications generally are subject to disclosure under the NVRA.[6]  We reached this conclusion in the context of the plaintiffs' request for rejected Virginia voter registration applications and for documents supporting those applications. *Id.* at 333.  Although the requested applications had been submitted in a timely manner by individuals in Virginia over a ten-month period before the November 2008 general election, the applicants were unable to obtain approval to vote in the 2008 election. *Id.*  The plaintiffs' request arose from a concern that many students who attended a Historically Black College in Norfolk, Virginia, had experienced difficulty in attempting to register to vote. *Id.*

Examining the statutory language, we concluded that "completed voter registration applications" plainly fell within the ambit of the NVRA's disclosure provision, because a state necessarily conducts as a "program" or "activity" an evaluation of those applications to verify an applicant's citizenship, age, and other information to ensure the accuracy of

---

[6] We note that our decision in *Project Vote* is the only federal court of appeals decision that has addressed the scope of the NVRA's disclosure provision.

15

the official lists of eligible voters. *Id.* at 336. We explained that the statute's use of the broad term "*all* records concerning the implementation" of such "programs and activities" required that the defendant-election officials in Virginia disclose the requested voter registration applications. *Id.* We also upheld the district court's requirement that disclosed voter applications be redacted to omit applicants' social security numbers, which qualified as "uniquely sensitive information."[7] *Id.* at 339 (citing *Greidinger v. Davis*, 988 F.2d 1344, 1355 (4th Cir. 1993) (holding that requiring disclosure of social security numbers on voter registration application records created an "intolerable burden" on the right to vote in violation of the First and Fourteenth Amendments)).

Finally, in *Project Vote*, we observed that the defendants' privacy concerns regarding registrants' personal information, including criminal history and mental incompetency, were not "unfounded," and that the disclosure of such information "may conceivably inhibit voter registration in some instances." *Id.* Nevertheless, emphasizing the importance of public disclosure to identify "error and fraud" in "the preparation and maintenance of voter rolls," we concluded that Congress had carefully considered the

---

[7] In reaching our conclusion in *Project Vote*, we also addressed the defendants' arguments that other statutes required maintaining confidentiality of the requested voter registration applications, because those statutes prevented disclosure of the "same type of personal information." *Id.* at 338 (addressing the Help America Vote Act of 2002, 52 U.S.C. § 21082(a), requiring confidentiality regarding provisional ballots, and the Military and Overseas Voter Empowerment Act, 52 U.S.C. § 20302, concerning privacy of overseas voters who request a voter registration application or an absentee ballot). We explained that those statutes were inapplicable because they shielded different sources of information and did not implicate the disclosure of the requested voter registration applications. *Id.*

"balance between transparency and voter privacy" in enacting the NVRA's disclosure provision. *Id.*

C.

In accord with our statutory analysis in *Project Vote*, we conclude that the Board's efforts in the present case to identify noncitizen registrants qualify as a "program" or "activity" to ensure an accurate list of eligible voters. *See* 52 U.S.C. § 20507(i)(1). As described in the 2016 Audit, the Board took numerous steps to confirm the citizenship of registrants for the 2016 general election and reviewed several sources of information. These activities, like the Norfolk, Virginia board of elections' review of completed voter applications in *Project Vote*, fall within the scope of the NVRA's disclosure provision. Moreover, the statute's use of the term "all records" relating to the Board's "implementation of" the program or activity to identify and remove noncitizens from the voter lists encompasses a broad range of disclosable documents, including completed voter applications. *See Project Vote*, 682 F.3d at 336.

This general principle articulated in *Project Vote*, however, does not require automatic disclosure of all categories of documents requested by the Foundation in the present case. As the district court observed, the essence of the records requested in the present case is distinct from the circumstances present in *Project Vote*. Unlike the request in that case, the Foundation's request necessarily implicates individuals who may have been or are currently under investigation for committing serious criminal offenses under

17

state and federal law for registering to vote or for voting in an election as a noncitizen.[8]

*See* N.C. Gen. Stat. § 163-275(1) (criminalizing as a felony offense fraudulent voter registration); 18 U.S.C. § 611 (criminalizing the act of voting in a federal election by a noncitizen); 18 U.S.C. § 911 (prohibiting noncitizens from asserting U.S. citizenship); 18 U.S.C. § 1015(f) (prohibiting making a false statement of citizenship in a voter registration application).

The record here shows that, at a minimum, the Board has disclosed to the United States Attorney documents involved in grand jury investigations of 789 individuals statewide, which documents currently may be subject to a sealing order and may overlap with those documents requested by the Foundation. Indeed, the Board moved in the district court to stay the proceedings in the present case based on those criminal investigations. ███████████████████████████████████████████ nothing in the NVRA prevents a district court from issuing an order to stay proceedings, when appropriate, to shield from disclosure the public records involved in an ongoing law enforcement investigation. *See Microfinancial, Inc.*, 385 F.3d at 78 (describing a district court's "discretionary power to stay civil proceedings in deference to parallel criminal proceedings" after engaging in a nuanced balance of certain factors).

There is a compelling governmental interest in protecting ongoing law enforcement investigations. *See Wash. Post*, 386 F.3d at 579; *see also Doe*, 962 F.3d at 142, 151-53. Accordingly, even though documents related to an ongoing investigation are not listed as

---

[8] We emphasize that simply because an individual is under investigation does not necessarily indicate any wrongdoing on her part.

18

an exemption in the NVRA's disclosure provision, the district court nevertheless must consider in the present case whether and to what extent the documents at issue should be kept confidential based on those investigations.

Moreover, the information requested by the Foundation necessarily includes registrants who at one time were identified by the Board as potential noncitizens, but since have been confirmed to be United States citizens. If the identities of those registrants were disclosed to the public, those individuals who ultimately were absolved of criminal wrongdoing nevertheless would be placed at risk of "public brand[ing]." *United States v. Briggs*, 514 F.2d 794, 803 (5th Cir. 1975); *see also Stern v. FBI*, 737 F.2d 84, 91-92 (D.C. Cir. 1984) ("[I]ndividuals have a strong interest in not being associated unwarrantedly with alleged criminal activity."); *United States v. Smith*, 123 F.3d 140, 148 (3d Cir. 1997) (explaining that grand jury secrecy ensures that "persons who are accused but exonerated by the grand jury will not be held up to public ridicule" (quoting *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 219 (1979)).

This risk, however, does not render the requested documents affiliated with potential noncitizens immune from disclosure under the plain language of the NVRA. Instead, as we explained in *Project Vote*, a district court can order redaction of "uniquely sensitive information" in otherwise disclosable documents. 682 F.3d at 339. Here, because of the criminal exposure related to the Foundation's request, sensitive information would include the identities and personal information of those subject to criminal investigations, and those United States citizens who were once identified by the Board as "potentially" failing to satisfy the citizenship requirement but later were exonerated. It is possible that a registrant

19

could have been "flagged" by the Board as a potential noncitizen, simply for failing to correctly complete the citizen status "check box" on the voter registration application. Being improperly identified as a noncitizen for such an oversight could have long-standing personal and professional repercussions.

Instead of disclosing these individuals' identities and subjecting them to potential embarrassment or harassment, the Board expressed at oral argument its willingness to devise a system of redaction to apply to requested voter registration applications and corresponding documents to the extent they are subject to disclosure.[9]  Such a system would advance these privacy interests while permitting the Foundation to identify "error and fraud" based on citizenship status in "maintenance of voter rolls" in the manner envisioned by Congress when it sought transparency and enacted the NVRA's disclosure provision. *Project Vote*, 682 F.3d at 339.

We therefore conclude that the district court erred in holding that the Foundation failed to state a claim under the NVRA's disclosure provision simply because the request implicated potential criminal conduct of registrants.  The disclosure provision does not contain such a blanket exemption and requires a more exacting and tailored analysis than what occurred in this case.

---

[9] We agree with the district court that any disclosure of sensitive documents such as birth certificates and passports would present similar concerns as the sharing of social security numbers.

On remand, the district court must consider separately which documents and information are subject to protection based on their relationship to ongoing criminal investigations, and order redaction to protect exonerated potential noncitizens and their sensitive information.[10] Should the Board devise a system of redaction as discussed above, the district court can review the individual documents and redactions to ensure that specific redactions correspond with materials protected from disclosure.

Additionally, we observe that because the district court dismissed the Foundation's complaint without permitting discovery, we cannot consider "every particular question that may arise with respect to the implementation" of the disclosure provision in this case. *Project Vote*, 682 F.3d at 340. As previously mentioned, the Foundation's request was wide-ranging and included the Board's correspondence and exchange with registrants, third parties, and state and federal agencies. We therefore agree with the Board that the Privacy Act, the Driver Protection Act, and any other statutory restrictions placed on the release of documents obtained through the SAVE system, may preclude the disclosure of documents obtained by the Board from the DMV and USCIS. We also observe that the MOA with USCIS, to the extent the MOA is consistent with the NVRA's disclosure provision, may bar disclosure of certain information from the SAVE system. However, without an understanding of the documents at issue, we cannot discern what type of

---

[10] We observe that since oral argument in this appeal, the district court, in a separate criminal grand jury proceeding, has lifted the seal and nondisclosure order regarding certain documents. Upon remand in the present case, the district court should consider the effect of this changed circumstance in its analysis regarding disclosure of requested documents.

21

information the Board obtained from these agencies that may require confidentiality.  On remand, the district court is required to evaluate which documents the Board possesses that are potentially subject to disclosure under the NVRA.  Then it must evaluate which of those documents should be shielded from disclosure on the bases identified above.  And, when the court determines that certain types of documents are subject to disclosure, the court must delineate any redaction protocols consistent with the NRVA necessary to protect sensitive information, including the names of those identified by the Board as potential noncitizens.

We therefore conclude that based on the extensive nature of the Foundation's request, the district court must examine in the first instance the types and kinds of information possessed by the Board that are relevant to the Foundation's claim. Accordingly, we hold that the district court erred in granting the motion to dismiss.

III.

For these reasons, we vacate the district court's judgment dismissing the Foundation's complaint, and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*
*WITH INSTRUCTIONS*

22